RONAYNE KRAUSE, P. J.
Defendant was convicted by a jury of five counts of assault with intent to do great *345 bodily harm less than murder, MCL 750.84, one count of second-degree murder, MCL 750.317, and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to 5 to 10 years’ imprisonment for each of his assault with intent to do great bodily harm less than murder convictions and to 30 to 60 years’ imprisonment for the second-degree murder conviction, all to be served concurrently. The court also imposed a mandatory two-year felony-firearm sentence, to be served consecutively as provided by the felony-firearm statute. Defendant appeals his convictions and sentences. We affirm defendant’s convictions but vacate his sentences and remand for resentencing.
The victims in this case were part of a group of friends who went to downtown Detroit to celebrate the graduation of Carlos Spearman. The group consisted of Spearman, Courtney “Cortez” or “Tez” Smith, DeMario Drummond, Philip Knott, Raleigh Ross, Zachery Easterly, Raymond Malone, and Ron Banks. Some of the friends were football players at Wayne State University at the time. Spearman and a few of the others were drinking, but Smith was not drinking and served as the group’s designated driver that evening. After being denied access to Club Envy because the bouncer deemed Spearman too intoxicated, the group headed to a Coney Island for him to sober up. On the way, the group encountered some men handing out fliers; one of the friends recalled that ámong the people handing out fliers was defendant’s eventual codefendant, Quintin King.[1]
*346 Also on the way, Easterly decided to relieve himself in an alley in which Courtney’s car was parked. Also parked there was another car, and while he was urinating, several people approached Easterly, one of whom expressed concern that Easterly was urinating on the person’s car. The friends’ recollections of how many people were in the approaching group varied, but several of them identified King, who proceeded to punch Easterly. Several of the friends also identified defendant as a member of the group.[2] The two groups had a brief physical struggle before separating approximately 12 feet from each other.
The two groups exchanged some words, and King said to Ross, “ ‘[W]e got a big fellow here. Here, got something for you.’ ” Then defendant flashed a gun he had in his pants at the group of friends. Defendant also commanded the group of friends to back up, and they obliged. Malone then heard King say to defendant, “ ‘Give me the Mag. Give me the Mag.’ ” Defendant then apparently passed the gun to King. Smith tried to neutralize the fight once the gun was shown. King then fired a shot into the pavement, and the group of friends fled, or attempted to flee, for safety. Spearman was shot in the leg, and Smith was fatally shot through his airway. Ten .45-caliber bullet casings were found at the scene.
During the ensuing homicide investigation, several of the friends were shown multiple photographic lineups, first including King, and later including defendant. In one of the latter arrays, Malone identified defendant as the “guy that handed [King] the gun.” Malone told the officer that defendant had said, “ T advise y’all to step back.’ ” Malone told the officer that *347 defendant then lifted up his shirt and flashed the gun. Malone did not see the gun being passed, but he assumed it happened because defendant showed the gun and King shot a gun that looked identical. Ross was shown a photographic array that included defendant and identified him in the photograph, but Ross did not see defendant do anything other than be a part of the group. Knott claimed to have spoken with police and looked at photographs, but the officer in charge of the case, Derryck Thomas, did not have a record of Knott being interviewed because Knott avoided being a part of the police investigation. There are no facts in evidence that the police acted improperly or suggestively with the photographic arrays, although defendant contends that it was improper to place him in the first spot on the photographic arrays that included him.
Allante Mosley,[3] who was in jail for charges unrelated to the instant case, approached officers because he claimed to have information about a homicide. Officer Thomas and an ATF agent spoke with Mosley and concluded that he just wanted help with his current charges. They remarked that Mosley looked like King, to the point of being possible brothers or mistaken for each other. There was never a deal reached between Mosley and the prosecution. Officer Thomas saw no value in adding Mosley to a lineup with King. However, Dequan Todd, who was also in jail awaiting unrelated charges of which he was eventually acquitted, shared a cell with Mosley for a month, during which time Mosley allegedly openly claimed in the jail ward that he was responsible for “ ‘the Wayne State murder.’ ” Todd later shared a cell with King and informed King of Mosley’s comments. King’s lawyer *348 mentioned Todd’s potential testimony to defendant’s lawyer; however, defendant’s lawyer decided that this information did not seem credible and never contacted Todd. However, after defendant was convicted, defendant moved for a new trial, asserting, inter alia, that Todd provided newly discovered evidence. The trial court denied the motion.
Defendant first argues that his identification by four witnesses was the product of impermissibly suggestive pretrial procedures that led to an irreparable misiden-tification. In particular, he argues that the photographic arrays were improper and that an expert witness should have been presented on the topic of eyewitness identification. Defendant argues that eyewitness identification is the least reliable kind of evidence in a criminal conviction, stating that there have been 250 exonerations based on DNA, 76% of which involved misidentification as a factor. Defendant relies on a recent New Jersey Supreme Court holding that discussed problems with identification testimony and a standard for how to judge the reliability of identification testimony. State v Henderson, 208 NJ 208; 27 A3d 872 (2011). He also argues that his in-court identification was highly unreliable and likely the product of false memories; for example, he argues, Knott identified him because he was one of the “ ‘only brothers sitting at the table,’ ” and this occurred almost two years after the incident. He argues that there was no independent basis for his identification other than unduly suggestive procedures before trial. See People v McElhaney, 215 Mich App 269, 286-288; 545 NW2d 18 (1996).
A trial court’s decision to admit identification evidence will not be reversed unless it is clearly erroneous. Clear error exists when the reviewing court is left *349 with a definite and firm conviction that a mistake was made. People v McDade, 301 Mich App 343, 356; 836 NW2d 266 (2013). Erroneously admitted identification testimony warrants reversal only when the error is not harmless beyond a reasonable doubt. People v Hampton, 138 Mich App 235, 239; 361 NW2d 3 (1984). A photographic identification procedure can be so suggestive as to deprive the defendant of due process. People v Gray, 457 Mich 107, 111; 577 NW2d 92 (1998). The fairness of an identification procedure is evaluated in light of the totality of the circumstances. People v Lee, 391 Mich 618, 626; 218 NW2d 655 (1974).
Defendant is of course correct in asserting that “identification was the key issue in this case,” so we agree that the propriety thereof is highly significant. We are aware that the state of New Jersey has expounded on the scientific evidence tending to show that eyewitness testimony is inherently unreliable. See Henderson, 208 NJ at 248-283. However, that case is not binding on this Court. See People v Jamieson, 436 Mich 61, 86; 461 NW2d 884 (1990) (opinion by BRICKLEY, J.). More importantly, irrespective of whether eyewitness testimony is unreliable in general, it requires a highly tenuous leap of logic to extrapolate that defendant’s identification in particular must be wrong. Furthermore, because fairness is assessed on the basis of a totality of the circumstances, it is also relevant whether defendant had a meaningful opportunity to argue to the jury why the witnesses should not be believed.
We note that Michigan is not unfamiliar with the concept that human memory and perception are fallible. The standard jury instruction, which the trial court properly gave to the jury, clearly requires the *350 jury to evaluate how reliable any witness’s identification might have been. Defendant had ample opportunity to argue why the specific witnesses against him should have been deemed unreliable, including why he believed Knott’s identification must be guesswork. We perceive no reason why placing defendant’s photograph first in a lineup is inherently suggestive, and in a random assortment the first slot is no less likely than any other. Defendant contends that the lineups were not “double blind,”[4] so the officers conducting the lineup might have subtly or unconsciously suggested a “correct” choice to the witnesses, but this conclusion is pure speculation. The fact that not all witnesses presented identical testimony or even identified defendant is simply normal. Any infirmities either were or could have been presented to the jury, and the jury was properly instructed to consider these infirmities. Whether or not the lineups could have somehow been conducted “better,” defendant has not satisfied his burden of establishing that the trial court erred by finding them not unduly suggestive.
Defendant next argues that he received ineffective assistance of counsel because trial counsel did not present an expert witness on eyewitness identification, did not object to Knott’s identification of him, and agreed to an erroneous jury instruction regarding identification rather than seeking an instruction based on the New Jersey case, Henderson, 208 NJ 208, referred to earlier in this opinion.
*351 Trial counsel is presumed to have been effective, and defendant must prove otherwise. People v Vaughn, 491 Mich 642, 670; 821 NW2d 288 (2012). We will not substitute our judgment for that of counsel regarding matters of trial strategy, nor will we assess counsel’s competence with the benefit of hindsight. People v Payne, 285 Mich App 181, 190; 774 NW2d 714 (2009). To constitute ineffective assistance, trial counsel’s performance must have fallen below an objective standard of reasonableness, and there must be a reasonable probability that counsel’s subpar performance affected the outcome of the proceedings, rendering the proceedings unfair or unreliable. People v Trakhtenberg, 493 Mich 38, 51, 55-56; 826 NW2d 136 (2012); People v Grant, 470 Mich 477, 486; 684 NW2d 686 (2004).
Trial counsel’s strategy was to persuade the jury that defendant was merely present at the scene of the crime and that he had no involvement in the shooting. As the lower court found in its decision on defendant’s motion for new trial, counsel made strategic and reasonable choices in light of his trial strategy. His cross-examination of witnesses worked with the court’s instructions on identification: he impeached witnesses on issues of intoxication, lighting, distance, discrepancies in descriptions, and the amount of time each witness had to make an observation. Although defendant believes that additionally presenting an expert on eyewitness testimony would have been helpful, and defendant may even be right, that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel’s performance was deficient. People v Petri, 279 Mich App 407, 412-413; 760 NW2d 882 (2008). Accordingly, counsel’s decision to rely on cross-examination to impeach the witnesses who identified defendant does not fall below an objective standard of reasonableness.
*352 With respect to the court’s instruction regarding identification, seeking an alternative instruction would have been inconsistent with counsel’s strategy, which, as already noted, tied into the instruction given. In any event, defendant urges the adoption of an instruction based on authorities not binding in Michigan, and trial counsel is generally not ineffective for failing to make a novel argument. People v Reed, 453 Mich 685, 695; 556 NW2d 858 (1996). To the extent defendant argues that counsel could have done better, it is difficult to conceive of a situation in which a trial attorney, reflecting on his or her performance in a trial, could not, with the benefit of hindsight and the luxury of ample time for consideration, find something in his or her performance that he or she could have done better. That, however, is not the standard for assessing whether trial counsel was effective. Trial counsel’s strategy was reasonable in light of Michigan law, and the strategy’s ultimate failure is simply not relevant.[5]
Defendant next continues his argument in favor of a new and novel jury instruction regarding identification. As noted, the New Jersey Supreme Court found its then-current instructions on identification inadequate in light of scientific advances and a growing understanding of relevant neuroscience. Henderson, 208 NJ 208. Defendant also notes that after this decision in New Jersey, the State Bar of Michigan formed a task force to address this issue here. The United States Court of Appeals for the First Circuit has also altered its identification instructions to inform *353 jurors that scientific studies show “the reliability of an identification doesn’t really depend upon how positive a person is.” United States v Jones, 689 F3d 12, 17 (CA 1, 2012). Defendant also argues that the aiding-and-abetting instruction given to the jury was improper because it does not accurately reflect the law or does not apply to all aiding-and-abetting cases. His argument rests on an assertion that the case from which the instruction is derived, People v Robinson, 475 Mich 1, 15; 715 NW2d 44 (2006), is significantly distinguishable from the matter at bar and itself reflects an exception to the general rule regarding instruction on convicting a defendant under an aiding-and-abetting theory, as decided in the recent United States Supreme Court case Rosemond v United States, 572 US_; 134 S Ct 1240; 188 L Ed 2d 248 (2014).
Claims of instructional error are reviewed de novo. People v Hall, 249 Mich App 262, 269; 643 NW2d 253 (2002), remanded in part on other grounds 467 Mich 888 (2002). Jury instructions are reviewed as a whole to see if they sufficiently protected a defendant’s rights. People v Huffman, 266 Mich App 354, 371-372; 702 NW2d 621 (2005). Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant’s rights. People v Milton, 257 Mich App 467, 475; 668 NW2d 387 (2003).
We have already discussed why the standard jury instruction regarding identification was appropriate in the instant matter. Defendant distinguishes Robinson by asserting that the codefendants in Robinson were friends, whereas there was no evidence here that defendant and King even knew each other. We find such an argument unavailing in the face of evidence that defendant handed King an apparently loaded gun. *354 We find it highly unlikely that anyone would simply hand over a gun to a complete stranger during a group confrontation, and even if someone did, it would reflect the most colossal and egregious disregard for the predictable result of that gun being discharged at another person. In Robinson, our Supreme Court reiterated that the necessary intent for second-degree murder is “the intent to kill, the intent to inflict great bodily harm, or the willful and wanton disregard for whether death will result.” Robinson, 475 Mich at 14 (emphasis omitted). The Court held that a defendant may be convicted under an aiding-and-abetting theory if the prosecution proves that the defendant aided or abetted the commission of an offense and “that the charged offense was a natural and probable consequence of the commission of the intended offense.” Id. at 15. To the extent Rosemond held otherwise, it limited its analysis to prosecutions for a particular statutory federal offense, which is of no relevance here. See Rosemond, 572 US at_; 134 S Ct at 1245. The aiding-and-abetting instruction given in this case may have been less than ideal, but we are constrained to follow Robinson and therefore cannot find error in the reading of that instruction.
Defendant next argues that the prosecutor committed misconduct and denied him a fair trial when the prosecutor told the jury that it could convict him based on a team theory of guilt, asked for sympathy for the deceased, argued facts not in evidence, used inflammatory and religious arguments, denigrated defense counsel, and misstated the law. A general claim that the defendant was denied his or her due-process right to a fair trial is a claim of nonconstitutional error, and defendant has not asserted that a specific constitutional right was violated. See People v Blackmon, 280 Mich App 253, 261-262, 269; 761 NW2d 172 (2008). *355 Consequently, even if the prosecutor committed an error, we would only reverse if it appears more likely than not that the error was outcome-determinative. People v Brownridge (On Remand), 237 Mich App 210, 216; 602 NW2d 584 (1999).
Defendant argues that the prosecutor not only denied him a fair trial by comparing the aiding-and-abetting theory of criminal culpability to teamwork, but that when coupled with the jury instruction, the burden of proof was shifted to him. We disagree. The prosecutor’s references to the way in which all members of a sports team share in the team’s victory was obviously a metaphor. Importantly, the trial court clearly instructed the jury that the arguments of counsel were not evidence. Unlike the instruction in Sandstrom v Montana, 442 US 510, 512-513, 524; 99 S Ct 2450; 61 L Ed 2d 39 (1979), which impermissibly specified a presumption of intent, the instruction given here explicitly charged the jury with assessing whether defendant had the requisite intent and made clear that defendant could not have been merely present. The prosecutor need not speak in the “blandest of all possible terms.” People v Cowell, 44 Mich App 623, 628-629; 205 NW2d 600 (1973). We find no error here.
Defendant next argues that the prosecutor imper-missibly asked for sympathy for the deceased. While the prosecutor used language that invoked grisly imagery of “transporting this young college student, this Wayne State University football player into a piece of meat sitting on a slab,” we do not think that language exceeds the bounds of permissibility. Further, the prosecutor’s argument that Knott’s lack of cooperation with authorities was because of Knott’s perception that “snitches end up in ditches” was a reasonable circum *356 stantial inference, one that the jury may have made on its own. See People v Bahoda, 448 Mich 261, 282-285; 531 NW2d 659 (1995).
The prosecutor’s use of a biblical reference could have appealed to a juror’s sense of religious duties, but in context, the quotation was merely a somewhat hyperbolic reference to the deceased victim as someone who had attempted to make peace that evening. It was not a reference to any religious beliefs per se, see People v Jones, 82 Mich App 510; 267 NW2d 433 (1978), and it did not call upon the jurors to convict on the basis of a religious duty, People v Rohn, 98 Mich App 593, 596-597; 296 NW2d 315 (1980), overruled in part on other grounds by People v Perry, 460 Mich 55, 64-65; 594 NW2d 477 (1999). There is no impropriety in merely referring to a story from the Bible that the prosecutor may reasonably presume the jurors, irrespective of their individual religious beliefs or affiliations, will likely find familiar. People v Mischley, 164 Mich App 478, 482-483; 417 NW2d 537 (1987).
The prosecutor’s reference to Mosley, the man who allegedly claimed responsibility for the murder while he was in jail on unrelated charges, as a “red herring” was not improper denigration of defense counsel, but rather a fair argument regarding what the jury should believe. Finally, the prosecutor’s statement that “the law permits conviction on adequate identification testimony alone” as long as it “proves beyond a reasonable doubt that the defendant was the person who committed the crime” does not misstate the law. We do not find any misconduct or deprivation of a fair trial.
Defendant next argues that the evidence was insufficient to support his convictions. He concedes that the evidence was sufficient for the jury to find that he displayed the gun, fired it into the ground, and *357 handed it to King. However, he contends that this evidence is insufficient to prove beyond a reasonable doubt that he aided and abetted second-degree murder.[6] We disagree.
Evidence is sufficient if, when viewed in the light most favorable to the prosecution, “a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.” People v Hampton, 407 Mich 354, 368; 285 NW2d 284 (1979). Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime. People v Carines, 460 Mich 750, 757; 597 NW2d 130 (1999). Juries, and not appellate courts, see and hear the testimony of witnesses; therefore, we defer to the credibility assessments made by a jury. People v Palmer, 392 Mich 370, 376; 220 NW2d 393 (1974). “It is for the trier of fact... to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences.” People v Hardiman, 466 Mich 417, 428; 646 NW2d 158 (2002). Consequently, we resolve all conflicts in the evidence in favor of the prosecution. People v Kanaan, 278 Mich App 594, 619; 751 NW2d 57 (2008).
The elements of assault with intent to do great bodily harm less than murder are: “(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder.” People v Parcha, 227 Mich App 236, 239; 575 NW2d 316 (1997). This Court has defined the intent to do great bodily harm as “an intent to do serious injury of an aggravated nature.” *358 People v Mitchell, 149 Mich App 36, 39; 385 NW2d 717 (1986). Second-degree murder is any kind of murder not otherwise specified in the first-degree murder statute. MCL 750.317. It is well established that “second-degree murder is first-degree murder minus premeditation” and without the perpetration or attempted perpetration of the felonies enumerated in the first-degree murder statute. People v Carter, 395 Mich 434, 437-438; 236 NW2d 500 (1975). To aid and abet the commission of a crime, the crime itself must be proved, and the defendant must have rendered some kind of assistance or encouragement to the commission of that crime with the intent that the crime occur or the knowledge that the principal intended for the crime to occur. People v Moore, 470 Mich 56, 63; 679 NW2d 41 (2004); Carines, 460 Mich at 757.
Defendant contends that because King fired into the ground and Spearman was only incidentally injured by a ricochet, defendant could not have had the requisite intent to cause great bodily harm. We disagree. It can be reasonably inferred that defendant’s flashing of the gun was a threat of force and that by passing the gun to King upon a request during a confrontation that had already become violent that defendant intended to do at least great bodily harm less than murder to someone in the group. Indeed, it is exceedingly difficult to imagine a scenario in which a person who is not being directly threatened or protecting others could make any use of a loaded gun on a city sidewalk during a confrontation without, at minimum, a serious disregard for safety. Merely pointing a loaded gun at another person is inherently dangerous; the notion that actually shooting a gun in the direction of another person, no matter how inaccurately, could reflect anything but an intent to cause serious harm is beyond comprehension.
*359 We also disagree with defendant’s contention that the evidence was insufficient to find him guilty of aiding and abetting second-degree murder. King was convicted of first-degree murder. The passing of the gun unambiguously rendered assistance to the commission of that crime and, indeed, was an indispensable part of the crime. We reject defendant’s contention that he was unaware of what King intended to do with the gun or did not intend the gun to be used in the way that King used it. There are a limited number of conceivable reasons why an angry individual presently involved in a violent confrontation might demand that a gun be handed to him, and most of them tend not to end in the gun going unused. There are, likewise, a limited number of conceivable ways in which a loaded gun can be used. The overwhelmingly likely inference is that defendant either knew that King intended to discharge the gun or intended for King to discharge the gun. Consequently, we find that the evidence is sufficient to support defendant’s convictions.[7]
Defendant’s final argument regarding his convictions is that he is entitled to a new trial on the basis of newly discovered evidence from Todd regarding Mosley’s alleged involvement in the crimes. Defendant contends that the evidence provided by Todd will prove the following: (1) Todd met Mosley at the Wayne County Jail, (2) Mosley admitted to Todd that he, not King, killed the football player from Wayne State, (3) Mosley told Todd that defendant was not involved, and (4) Mosley told Todd that defendant never passed Mosley the gun.
“Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence.” People v Grissom, 492 Mich 296, 312; 821 *360 NW2d 50 (2012). This policy is consistent with requiring parties to “use care, diligence, and vigilance in securing and presenting evidence.” Id. (quotation marks and citations omitted). When determining whether a new trial may be granted because of newly discovered evidence, “a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.” People v Cress, 468 Mich 678, 692; 664 NW2d 174 (2003), quoting People v Johnson, 451 Mich 115, 118 n 6; 545 NW2d 637 (1996), and MCR 6.508(D) (quotation marks omitted). The trial court found that the fourth requirement, the probability of a different result on retrial, had not been satisfied; consequently, the trial court impliedly found the other factors satisfied. We review the trial court’s findings of fact for clear error, MCR 2.613(C), and its decision for an abuse of discretion, People v Lemmon, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998).
We note first that Todd’s testimony is to some extent corroborated by an official report that Mosley actually attempted to confess to a murder while in jail. However, it is undermined to an equal extent by the fact that it appears that nothing came of that purported confession. The fact that Mosley made a clear and obvious statement against his own penal interest by stating that he was responsible for “ ‘the Wayne State Murder’ ” and was the person who “ ‘grabbed the gun’ ” and “ ‘shot him’ ” tends to exonerate King, and, to the extent Mosley also stated that defendant was uninvolved, this testimony would also exonerate defendant. Furthermore, Mosley’s awareness that the altercation that resulted in the murder began because “ ‘somebody *361 pissed on something’ ” suggests more than casual knowledge of the circumstances of the case. However, again undermining the testimony, Todd said this admission came up because everyone was calling Mosley a snitch in jail because he may have leaked information about the Wayne State murders, but Mosley told them that “ T can’t be a snitch against myself,’ ” implying that he committed the murders. The circumstances therefore suggest that it was strongly to Mosley’s immediate benefit to claim to be a murderer rather than a snitch. We note also that the eyewitnesses were shown photographs of Mosley and denied that he was the shooter, and the jury reviewed photographs of Mosley, defendant, and King.
On its face, the proffered evidence is highly equivocal. Todd testified at the hearing on defendant’s motion for a new trial, and the trial court thus had a better opportunity than this Court to observe and evaluate his credibility. See People v Canter, 197 Mich App 550, 560-562; 496 NW2d 336 (1992). The clear-error standard does not permit us to attempt to discover a “right” factual finding, but rather obligates us to defer to the trial court unless definitely and firmly convinced it made a mistake. See Hill v City of Warren, 276 Mich App 299, 308-309; 740 NW2d 706 (2007). The abuse-of-discretion standard is even more deferential. An abuse of discretion will be found only if the trial court’s decision falls outside the range of principled outcomes. People v Blackston, 481 Mich 451, 467; 751 NW2d 408 (2008). If we cannot say with confidence that the record discloses a clear mistake or omissions that preclude meaningful review, any doubts we might have flowing solely from the question being close must be resolved in favor of leaving the trial court’s decision untouched. See McGonegal v McGonegal, 46 Mich 66, 67; 8 NW 724 (1881). The extent to which the proffered evidence *362 is persuasive is matched by the extent to which it is dubious. We are therefore unable to find that the trial court made a clear error or committed an abuse of discretion.
Lastly, defendant argues that the trial court improperly enhanced his sentence by scoring Offense Variable (OV) 5 at 15 points on the basis of facts not found by the jury and that, without the improperly considered evidence, OV 5 should have been scored at zero points. The trial court commits plain error when it calculates an OV score “using facts beyond those found by the jury or admitted by the defendant” if that miscalculation “would change the applicable guidelines minimum sentence range.” People v Lockridge, 498 Mich 358, 399; 870 NW2d 502 (2015).[8] Defendant preserved this issue in the trial court, a scenario Lockridge predicted would be rare. Id. at 394. Defendant correctly states that OV 5 should be scored at either 15 or zero points depending on whether “serious psychological injury to the victim’s family may require professional treatment,” MCL 777.35, and the only evidence thereof was presented by the victim’s *363 family at sentencing. Consequently, OV 5 should have been scored at zero points, and the reduction of 15 points from defendant’s total OV score, from 105 to 90, reduces his OV level from III to II. Because second-degree murder, MCL 750.317, is a Class M2 offense against a person, MCL 777.16p, this would reduce defendant’s minimum sentence range from 315-525 months to 270-450 months. MCL 777.61.
Even though defendant’s minimum sentence of 360 months lies within both the scored and the corrected minimum sentence ranges, because the sentence range itself has changed, our Supreme Court’s historical interpretation of the sentencing guidelines would constrain us to vacate defendant’s sentence and remand for resentencing. People v Francisco, 474 Mich 82, 91-92; 711 NW2d 44 (2006). However, in the wake of Lockridge, improperly calculated sentencing guidelines ranges are reviewed for harmlessness, which necessitates remanding for possible resentencing in accordance with United States v Crosby, 397 F3d 103 (CA 2, 2005), as described in Lockridge. See Stokes, 312 Mich App at 197-203.
We affirm defendant’s convictions, but we remand, consistently with Crosby, for possible resentencing. We do not retain jurisdiction.
K. F. KELLY, J., concurred with RONAYNE KEAUSE, P. J.

 King was found guilty of first-degree murder, six counts of assault with intent to commit murder, and felony-firearm. His convictions are not at issue in the instant appeal.

 A significant issue at trial and on appeal is whether that identification was accurate.

 Mosley is also spelled “Moseley” in jail records.

 “Double blind” is a scientific term referring to a manner of conducting a study in which neither the subjects nor the experimenters know which of multiple variables is which, generally accomplished by some kind of coding system and logged randomization that can be retrieved after the study is completed. The purpose of double-blind testing is, as defendant points out, to ensure that the experimenters’ own perceptions and biases do not unconsciously affect the outcome of the test.

 Our dissenting colleague has provided a thorough analysis and summary of the current state of scientific knowledge regarding eyewitness identification, and properly agrees that our present jury instruction regarding eyewitness testimony remains the law. The Court of Appeals is an error-correcting court, and we are unpersuaded that it was erroneous for the trial court or defense counsel to follow the law.

 Defendant’s argument in this regard relies, in part, on his assertion, addressed and rejected earlier in this opinion, that the jury was improperly instructed.

 Defendant’s felony-firearm charge is derivative of the other charges.

 We are aware that elsewhere in the same opinion, our Supreme Court in Lockridge also stated “that trial courts must assess the “highest number of points possible’ to each variable, ‘whether using judge-found facts or not.’ ” People v Stokes, 312 Mich App 181, 196; 877 NW2d 752 (2015), quoting Lockridge, 498 Mich at 392 & n 28. We find it difficult to reconcile that statement with the holding that the offense variables are to be scored only on the basis of facts necessarily found by the jury or admitted by the defendant. However, we understand that in Stokes this Court concluded that it could reconcile the disparate statements in Lockridge by determining that judges may score the offense variables on the basis of facts they found independent of the jury and the defendant’s admissions on the theory that doing so constitutes a departure, Stokes, 312 Mich App at 195-197, which now need only be justified as reasonable, Lockridge, 498 Mich at 392. Because we cannot state with confidence that any other interpretation of Lockridge is superior, we decline to declare a conflict with Stokes.