# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

KEVIN TERRELL MACK,

       Defendant-Appellant.

UNPUBLISHED
November 22, 2016


No. 328258
Wayne Circuit Court
LC No. 14-009216-01-FH

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Defendant Kevin Mack appeals as of right his jury trial convictions of possession with intent to deliver less than 5 kilograms of marijuana, MCL 333.7401(2)(d)(*iii*) (second offense), felon in possession of a firearm (felon-in-possession), MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm) (second offense), MCL 750.227b, and maintaining a drug house, MCL 333.7405(d). Mack was sentenced, as a third habitual offender, MCL 769.11, to concurrent terms of 34 months to 8 years in prison for the possession with intent to deliver conviction, five years in prison for the felony-firearm conviction, and time served for the maintaining a drug house conviction. Mack was also sentenced to serve 34 months to 10 years in prison for the felon-in-possession conviction, to be served consecutively to the mandatory five-year term for felony-firearm. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On September 26, 2014, the Detroit Police Department raided Mack's home. Earlier in the day, an officer had observed what he believed to be three hand-to-hand narcotics transactions where Mack provided three different people with an item using an "overhand closed fist" and received United States currency in exchange. Based on the observations and information from a confidential informant that narcotics sales were occurring at the address, the police obtained a search warrant.

According to the prosecution witnesses, several police officers arrived, apprehended Mack on the home's front porch, and then searched the house. The officers located a shotgun leaning against a wall in an upstairs bedroom. On the dresser in the bedroom, the officers found a Michigan state identification card that belonged to Mack. Under the bed, they discovered a large, clear bag of marijuana, bags that could be vacuum sealed, and a digital scale. Finally, the

prosecution also presented testimony that Mack had $819 in denominations consistent with someone engaging in the sale of narcotics.

Mack, however, presented evidence that he had a medical marijuana card, had recently purchased 2.5 ounces of medical marijuana, and that he had about 2 ounces of marijuana in a lockbox in his bedroom, along with a digital scale. Mack testified that he had a large amount of cash because he had just been paid for mechanic work by his father; the money was in assorted denominations because that was how the customers had paid his father. He asserted that he did not know that there was a gun in the house, and his sister, the property owner, testified that it was her gun and that, contrary to the police testimony, she kept it locked in the upstairs closet. Mack explained that his room was downstairs and that the upstairs room belonged to his sister and her fiancé. He further testified that the police had broken open his lockbox by striking it against the floor. There was also testimony suggesting that the police had mixed Mack's marijuana with that of Douglas Hill, who also had a medical marijuana card. Hill testified that he was at the house when the raid occurred and he identified some of the seized marijuana as his.

## II. JURY REQUEST

### A. STANDARD OF REVIEW

Mack first argues that the trial court erroneously refused the jury's request to view an exhibit. Generally, we review a trial court's decision regarding a jury's request to review evidence for an abuse of discretion. *People v Davis*, 216 Mich App 47, 56; 549 NW2d 1 (1996). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). "A trial court necessarily abuses its discretion when it makes an error of law." *Id*. at 723.

### B. ANALYSIS

During deliberations, the jury requested permission to see the gun, pictures of the rooms, and "the-24-hour sheet."[1] The trial court provided them with the gun and the pictures, but with regard to the 24-hour sheet, the court sent the jury a note stating "The 24 hour sheet was not admitted as evidence and will not be provided to you." It is undisputed that the 24-hour sheet was, in fact, admitted into evidence as exhibit 16.

MCR 2.513(P) provides in pertinent part:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence that has not been allowed into the jury room under subrule (O), the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. . . . The court may order the jury to deliberate further without the requested review, as long as

---

[1] A 24-hour information sheet is a police investigative document that lists all individuals present at a location being investigated.

the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

It is plain that the jury's request to see a one-page exhibit was reasonable. Nevertheless, because the trial court erroneously believed that the 24-hour sheet was not admitted, it refused the jury's request to see it and in the process foreclosed the possibility of a later review of the exhibit in violation of MCR 2.513(P).

Generally, "a preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999), quoting MCL 769.26. Mack, however, argues that a harmless error analysis cannot be applied to violations of MCR 2.513(P). In support, he directs this Court to our Supreme Court's decisions in *People v Howe*, 392 Mich 670; 221 NW2d 350 (1974) and *People v Henry Smith*, 396 Mich 109; 240 NW2d 202 (1976).

In *Howe*, our Supreme Court reversed the defendant's conviction after finding (1) the court rule was violated when the court foreclosed the possibility of the jury rehearing testimony from two key witnesses, and (2) the error was not harmless beyond a reasonable doubt "when viewed in the context of the entire record[.]" *Howe*, 392 Mich at 677-678. In *Henry Smith*, the trial court preemptively instructed the jury that it would "not reread any testimony, so don't ask for that." *Smith*, 396 Mich at 110. After concluding that the instruction violated the court rule, our Supreme Court declined to apply a harmless error analysis, reasoning that application of the harmless error rule was inappropriate in the absence of a factual basis to review whether the error was harmless. *Id*. at 111-112. In other words, because the trial court had preemptively foreclosed the possibility of the jury rehearing testimony, it was impossible to determine what, if any, evidence the jury may have wanted to rehear, so any harmless error analysis would be based wholly on speculation. *Id*. Thus, *Howe* provides that generally the harmless error rule applies to violations of the court rule, whereas *Smith* provides that a defendant is entitled to reversal in cases where there is no factual basis to determine the effect of the error. As such, we reject Mack's assertion that *Howe* and *Henry Smith* require that his conviction be automatically reversed because the trial court violated MCR 2.513(P).

Here, unlike *Smith*, where the harmless error rule could not be applied, we know what evidence the jury wanted to view: the 24-hour sheet. The jury note requesting the exhibit was time-stamped one minute after deliberations began, which supports an inference that the jury was preemptively requesting several pieces of evidence. The contents of the 24-hour sheet were also testified to by multiple police officers during the prosecution's case-in-chief and during rebuttal. Although the jury was not permitted to see the sheet, it never requested to rehear the testimony of the police witnesses, which further suggests that the jury was not actively confused by the evidence presented. Finally, even assuming that the jury was confused about the contents of the 24-hour sheet, if it had been provided, it would only serve to bolster the prosecution's case at the expense of the defense case. Our review of the record shows that the prosecution theory was that Hill and his marijuana were not present during the raid whereas the defense theory was that Hill was present and his marijuana was mingled with Mack's marijuana. The 24-hour sheet supported the prosecution's theory given that Hill's name did not appear on it even though the document purported to list all people the police had contact with at Mack's home. Thus, even if

-3-

the jury had viewed the sheet, it would have only served to corroborate testimony that Hill was not present even though he asserted that he was. Accordingly, the error in this case was harmless, so reversal is not required.

## III.  INEFFECTIVE ASSISTANCE

### A.  STANDARD OF REVIEW

Mack next argues that his trial lawyer provided ineffective assistance when he did not request a jury instruction on the lesser included offense of simple possession. Whether a defendant was provided effective assistance of counsel presents questions of both fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "This Court reviews findings of fact for clear error and questions of law de novo." *Id*. However, where a defendant did not move for a new trial or an evidentiary hearing in the trial court, this Court's review is limited to errors apparent from the record. *Id*., citing *People v Hoag*, 460 Mich 1, 7; 594 NW2d 57 (1999).

### B.  ANALYSIS

In order to establish a claim that his trial lawyer provided ineffective assistance, Mack must overcome the presumption that his lawyer provided effective assistance. *People v Blevins*, 314 Mich App 339, 351; ___ NW2d ___ (2016). Moreover,

> We will not substitute our judgment for that of counsel regarding matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight. To constitute ineffective assistance, trial counsel's performance must have fallen below an objective standard of reasonableness, and there must be a reasonable probability that counsel's subpar performance must likely have affected the outcome of the proceedings and rendered the proceedings unfair or unreliable. [*Id*. (citations omitted).]

A criminal defendant must also establish the factual predicate for his claim. *Hoag*, 460 Mich at 6.

Mack argues that possession of marijuana, MCL 333.7403(2)(d), is a necessarily lesser included offense of possession with intent to deliver marijuana and that if his trial lawyer had requested an instruction on possession of marijuana, the trial court would have been required to give it. However, "[f]ailing to request a particular jury instruction can be a matter of trial strategy." *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Here, the defense theory was that the shotgun and some of the marijuana the police recovered during the raid did not belong to Mack and that any marijuana he did have was in his possession lawfully in compliance with a medical marijuana permit. In support of that theory, Mack testified that he kept his marijuana in a lockbox in his downstairs bedroom. He told the jury that a police officer broke open the box by smashing it against the floor a few times and that, when it opened, the police took his legally possessed marijuana and his digital scale. Hill testified that the police also took his marijuana, which he had legally purchased, and that his marijuana was included in the bag of marijuana that the police claimed they had found under the bed in an upstairs bedroom. Given that the defense theory was, therefore, plainly that Mack had never possessed

more than a legal amount of marijuana, the decision not to seek an instruction on the lesser offense of simple possession was strategic and is not grounds for a finding of ineffective assistance.

Moreover, even if Mack had established that his trial lawyer's performance was objectively unreasonable, there has been no showing that any such unreasonable performance would likely have affected the outcome of the proceedings and rendered the proceedings unfair or unreliable. *Blevins*, 314 Mich App at 351 (citation omitted). A police officer testified that he observed Mack conducting what he characterized as three narcotics sales from the front doorway of his home. A large quantity of marijuana, a digital scale, vacuum bags and a shotgun were recovered by the police from the same bedroom where Mack's state identification card was found on the dresser. Mack was also apprehended with sums of money that were consistent with someone selling narcotics. Under these circumstances, Mack simply has not met his burden of demonstrating outcome-determinative error. *Id*.

## IV. JUDICIAL MISCONDUCT

### A. STANDARD OF REVIEW

Finally, Mack argues that the trial judge's conduct during the trial pierced the veil of judicial impartiality. "The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). Mack, however, did not object to the alleged instances of misconduct, so our review is for plain error affecting his substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). Under the plain error rule, a defendant must demonstrate that an error occurred, that it was clear or obvious, and that it affected substantial rights, i.e., that it affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

### B. ANALYSIS

"A judge's conduct pierces [the veil of judicial impartiality], and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171. It is presumed that the trial judge was impartial. *Id*. at 175. Further, when "evaluating the totality of the circumstance, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions." *Id*. at 172.

Mack first argues that the trial judge pierced the veil of judicial impartiality when he questioned Hill. During earlier questioning by the court, Hill testified that some of the marijuana he had purchased earlier in the day was included in the prosecutor's exhibit 5.[2] Hill testified that he knew some of his marijuana was included in the bag because "it looked like the buds I had." He further testified that his marijuana had been in a different bag when he brought it to Mack's house and that he did not see that bag inside exhibit 5. The jury then submitted several questions, one of which was "Can you tell, looking at this bag of marijuana, as to what marijuana is yours?" Hill answered that he could not because all the marijuana in the bag was "the same strand." Mack's lawyer then asked him what a strand was and Hill explained that it depended on indicas and sativas. He stated that the strand in the bag was "known as Larry." The jury, still apparently confused, then asked "How do you know that 1.5 ounce of your marijuana is in Exhibit Number 5 or don't you know that?" Hill answered "I just know for a fact this look like my marijuana." The court then asked:

> *Q.* It just looks like your marijuana?
>
> *A.* Yeah, these look like the buds in which I had, but just more of it.
>
> *Q.* I see. But you don't see the bag—or do you see the bag in which you had the 1.5 ounce of marijuana that you had on the table in this bag, Exhibit Number 5?
>
> *A.* No, my container, no, sir.

Mack argues that these two questions by the trial judge exhibited disbelief in and skepticism of Hill's testimony. However, viewed in context, it is apparent that the jury was confused about Hill's testimony regarding exhibit 5 because they asked two questions about it. Thus, the judge's questions were designed to clarify matters for the jury, which is permissible. See *id*. at 173 (holding that the purpose of judicial questioning should be to clarify matters when necessary in order to "produce fuller and more exact testimony or elicit additional relevant information"). Additionally, the judge allowed Mack's lawyer to further question Hill on the issue, thereby providing a fuller examination of the issue. We further note that there is no indication that the judge's tone or demeanor was inappropriate when he questioned Hill. The scope of the questioning was also relatively brief given that this was a five-day trial with numerous witnesses for both the prosecution and the defense, and the judge's questioning of witnesses was not confined to defense witnesses. See *id*. at 172. Finally, the judge also gave the following curative instruction:

> It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you

---

[2] Exhibit 5 was the marijuana that the prosecutor alleged Mack possessed with the intent to deliver. It was weighed at 106.1 grams.

should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case from the evidence.

We therefore conclude that under the totality of the circumstances, the trial judge did not pierce the veil of judicial impartiality when he questioned Hill.

Mack next argues that the trial judge pierced the veil of judicial impartiality by questioning him. "A judge must proceed with particular care when engaging with a criminal defendant." *Id*. at 175. Here, Mack challenges the following judicial questioning:

> *Q*. Mr. Mack, the scale that is part of Exhibit 6, is this your scale?
>
> *A*. Yes, sir.
>
> *Q*. Why do you have a digital scale?
>
> *A*. So I can measure the medicine. Not all the time I arrive with my lockbox. It will be a lot of times where I just put some in the little pill thing that the doctors—not the doctors, but the dispensaries prescribe you. They give you like a pill bottle.
>
> *Q*. But dispensaries have their own scale and they weigh the marijuana as they dispense it, isn't that true?
>
> *A*. Yes, sir.
>
> *Q*. So why then would you have your own scale?
>
> *A*. Because I buy two ounces and a half at a time when I do buy it. And not all the time to all the functions that I go to do I want to ride with two and a half ounces.
>
> *Q*. I don't quite understand that. Do you have a particular—you know you can't buy more than two and a half ounces, right, from the dispensary?
>
> *A*. Yes.
>
> *Q*. Okay. And the dispensary weighs it for you when you buy it, right?
>
> *A*. Yes, sir.
>
> *Q*. So anything less than that you would still be in conformity with the law; isn't that true?
>
> *A*. Yes, sir.
>
> *Q*. There would be no reason then to weigh it before you go someplace, isn't that true?

*A*. It's very expensive, and I like to keep track of what I'm doing. That is my specific reason for weighing and measuring what I'm doing, that's all.

Mack argues that this questioning was inappropriate because it showed that the judge doubted that he had a lawful purpose for having the scale. Although a judge may question a witness to clarify and produce fuller and more exact testimony, "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally." *Id*. at 174. Here, however, the judge does not appear to be expressing disbelief. Rather, he questioned Mack on a matter that the defense and the prosecution had not fully touched upon, thereby producing fuller and more exact testimony. Further, he fully allowed Mack to answer the questions, explaining why he had a digital scale even though it did not appear necessary. Although the prosecutor referred the jury to this particular line of questioning during his closing argument, the answers elicited by the judge were also useful to the defense given that they helped negate an inference that Mack was selling marijuana. Additionally, in the absence of an objection indicating that the judge's tone or demeanor was somehow inappropriate, the "very nature of the words" used in the above questioning do not appear to be inappropriate. See *id*. at 176. Moreover, the judge also provided a curative instruction to the jury, which weighs against a finding of judicial partiality. *Id*. at 190. Given that there is no indication of "substantial judicial bias" from the judge's questioning of Mack (and other defense and prosecution witnesses), we do not find that the curative instruction given was insufficient to alleviate any inference of judicial bias the jury may have perceived. See *id*. Accordingly, under the totality of the circumstances, the trial court's questioning of Mack did not indicate any appearance of advocacy or partiality against defendant, and this line of questioning did not impact defendant's right to a fair trial. *Id*. at 171.

Mack also contends that the trial judge belittled his trial lawyer throughout the trial. We address the alleged instances in turn. First, after Mack's lawyer stated he was waiting for a license to be copied, the judge stated "I'm sorry my staff is so inefficient that they haven't provided it to you quicker." Although this comment may have been meant to belittle Mack's lawyer, it is equally possible that it was nothing more than a joke designed to lighten the mood while everyone was waiting for the license to be copied. In the absence of an objection indicating that the judge's tone and demeanor were inappropriate, see *id*. at 176, we do not find that this comment belittled Mack's lawyer.

Next, Mack asserts that the court told his lawyer to "just stop talking now" on one occasion and "this is not a circus" on another occasion. Although these comments express irritation and impatience with Mack's lawyer, they are not so egregious that they created an appearance of advocacy or partiality against Mack. See *id*. at 171. Moreover, our review of the record indicates that the trial judge tends to speak very directly to everyone in his courtroom, including prosecution witnesses, court staff, and jurors. See *Jackson*, 292 Mich App at 598 ("Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality."). Further, as indicated above, the judge instructed the jury to disregard any opinion that it believed he might have about the case and to only decide the case based on the evidence. Jurors are presumed to follow their instructions, and the instruction given

was adequate to ensure a fair trial despite the judge's irritated comments directed toward Mack's lawyer. See *id*. at 177, 190.[3]

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Stephen L. Borrello

---

[3] The judge also questioned Mack about the amount of money he paid for the 2.5 ounce of marijuana that he claimed he had legally purchased. The court stated that Hill had testified to paying a significantly lower price for the same amount of medical marijuana. Mack's lawyer objected to the questioning, asserting that the trial court had misstated Hill's testimony. The trial court initially refused to alter its line of questioning or give the jury a curative instruction. However, after a break, the judge instructed the jury that it had been mistaken when it stated that Hill and Mack had given different prices for the same quantity of marijuana. Thus, given that the judge's curative instruction specifically addressed this point and admitted that its questions were in error, we do not see this as an instance of judicial misconduct.