*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRANDEN DANIEL KLYK,

Defendant-Appellant.

UNPUBLISHED
June 23, 2025
10:28 AM

No. 368497
Marquette Circuit Court
LC No. 2022-061623-FC

Before: GARRETT, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Defendant, Branden Daniel Klyk, was involved in an on-again, off-again dating relationship with the complainant, NG. She has two daughters with her ex-husband, and Klyk grew jealous of her communications with her ex-husband regarding their daughters. The relationship eventually became physically violent. After spending time at two bars one night, Klyk became enraged at NG and assaulted her physically and sexually. He appeals by right his jury-trial convictions of torture, MCL 750.85; first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(c) (sexual penetration under circumstances involving the commission of another felony); unlawful imprisonment, MCL 750.349b; two counts of assault with intent to do great bodily harm less than murder or by strangulation (AWIGBH), MCL 750.84; and third-offense domestic violence, MCL 750.81(4).[1] Klyk argues on appeal that the evidence was insufficient to support his torture and CSC I convictions. Because his arguments are not meritorious, we affirm.

## I. FACTS

On June 26, 2022, NG met Klyk at a local bar after he played in a softball tournament. Afterward, they had consensual sex at her house. They then went to a party at another bar before they returned to NG's house, where they had consensual sex a second time before falling asleep. At some point, NG awoke and noticed that Klyk was already awake and appeared upset. She asked him what was wrong, but he did not respond. She surmised, based on previous arguments with

---

[1] The jury acquitted Klyk of larceny in a building, MCL 750.360.

-1-

him, that he had looked through her cell phone and became upset about her ex-husband. She got up and went into the bathroom.

When NG returned to the bedroom, Klyk still appeared upset. She laid on her back on the bed with her arms at her sides, at which point Klyk sat on her chest, putting his knees on top of her arms. He retrieved a bag from the bedside table, which contained a sleep mask and Velcro straps with wrist holders. He placed the sleep mask over NG's eyes and asked her where she slept while she was away from home at her daughter's softball tournament. When she responded that she had slept with her daughter, Klyk slapped her across her face. He then asked her if she was attending a music festival in July with her friends. After she responded "no," Klyk asked her if she could "feel it coming" before he slapped her in the face again.

Next, Klyk placed both hands around NG's neck, choking her. She was unable to breathe, and, after approximately five seconds, he released his hands, leaving her "gasping for air." Klyk resumed questioning her before he removed the Velcro straps from the bag and began tying them to the bed while telling her that he was going to tie her up. As Klyk tied the left strap, NG cried, asked him to stop, and told him that she did not want "to do that." Klyk tied her left wrist to the bed, but the clip on the right strap broke. He became angry and hit her in the leg with the broken clip, which cut her leg open and left her "bleeding pretty good."

Klyk then sat on top of NG's chest and again choked her with both hands. He stopped after approximately five seconds, untied her left hand, and told her to "lay on the side of the bed with [her] head off, and . . . open [her] mouth." She did so, and Klyk put his penis in her mouth and "thrusted as hard as he could." She pushed him away from her, telling him that she could not breathe, but he told her to lay back down and "did it again." By that point, NG was no longer wearing the mask over her eyes.

When Klyk stopped sexually assaulting her, NG went to the kitchen to get a glass of water. Klyk followed her to the kitchen and began talking about her ex-husband, telling her that he was going to be "skinned" and found "dead in the mudroom" of his home. When he left the kitchen and went downstairs, NG hurried to unlock the front door, grabbed her keys, and ran to her truck. Because she did not have her cell phone with her, she called 911 using her vehicle's OnStar system. She saw Klyk walk out of her house and toward the truck. She backed out of the driveway and drove to a nearby elementary school because the 911 dispatcher told her to drive to a safe location.

Forsyth Township Detective-Sergeant Justin Wonch met NG in the elementary school parking lot. He observed marks on NG, including a "giant goose egg" on her forehead, redness on her neck, blood on her lip, and a cut on her leg. NG told him details regarding the incident and described the entire incident to Forsyth Township Police Officer Cassie Smith later that day. Thereafter, NG's primary care provider diagnosed her with Post-Traumatic Stress Disorder and anxiety. She also had trouble sleeping and did not stay at her house for "a long time." The jury convicted Klyk as previously described. This appeal followed.

## II. STANDARD OF REVIEW AND GENERAL LEGAL PRINCIPLES

It is axiomatic that a prosecutor must prove the defendant's guilt beyond a reasonable doubt. *People v Prude*, 513 Mich 377, 384; 15 NW3d 249 (2024). "[A] conviction that is not

supported by sufficient evidence to prove guilt beyond a reasonable doubt violates due process and cannot stand." *Id*. In order to convict a defendant, the jury must determine that the prosecution proved every element of the charged offense. *People v Posey*, 512 Mich 317, 323; 1 NW3d 101 (2023).

We review de novo a challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We "review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). "The standard of review is deferential," and we must "draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*. (quotation marks and citation omitted).

## III. TORTURE

Klyk argues that the evidence was insufficient to sustain his torture conviction because the prosecution failed to establish that he caused NG severe mental pain or suffering through one of means set forth in MCL 750.85. We disagree. The evidence showed that Klyk threatened to kill both NG and her ex-husband.

MCL 750.85(1) states that "[a] person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture . . . ." See also *People v Schaw*, 288 Mich App 231, 233; 791 NW2d 743 (2010). MCL 750.85(2)(d) defines "severe mental pain or suffering" as:

> [A] mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:
>
> (*i*) The intentional infliction or threatened infliction of great bodily injury.
>
> (*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.
>
> (*iii*) The threat of imminent death.
>
> (*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

Klyk contends that the prosecution failed to establish any one of the four alternatives enumerated under MCL 750.85(2)(d).

Klyk asserts that NG did not testify that he threatened to kill her, and, although she testified that he threatened to kill her ex-husband, he did not threaten imminent death. The record shows that NG was unable to recall at trial whether Klyk threatened her during the incident, but she thought she was going to die. Detective-Sergeant Wonch testified, and his body camera footage

-3-

confirmed, that NG told him immediately after the incident that Klyk threatened to kill her and her ex-husband. In addition, Officer Smith testified that NG told her that Klyk threatened to kill NG while he assaulted her and that, afterward in the kitchen, Klyk "continued to tell her how much he hated her, and how much he wanted to kill her."

In addition, the record shows that Klyk threatened the imminent death of NG's ex-husband. NG testified that Klyk told her in the kitchen that she should not drop her daughters off at her ex-husband's house because he was going to be "skinned" and "dead in the mudroom." Officer Smith corroborated NG's testimony. Officer Smith testified that NG told her that Klyk warned NG not to "bring her kids, daughters, back to their stepdad [sic] on the day that they usually do because she would find [him] dead in the garage or skinned alive." Although the record does not establish when NG was scheduled to drop her daughters off at their father's house, it can be inferred from Officer Smith's testimony that NG and her ex-husband exchanged parenting time on a routine basis. See *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016) ("Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime.").

Therefore, the evidence was sufficient to permit a rational juror to find that NG suffered severe mental pain and suffering as a result of Klyk's threats and that the threats satisfied MCL 750.85(2)(d)(*iii*) and (*iv*). As such, the evidence was sufficient to support Klyk's torture conviction.

## IV. CSC I

Klyk next argues that insufficient evidence supported his CSC I conviction because there was no direct interrelationship between his sexual penetration of NG and his unlawful imprisonment of her. We disagree.

CSC I, as charged in this case, required the prosecutor to prove that "(1) sexual penetration occurred," (2) " 'under circumstances involving the commission of any other felony.' " *People v Lockett*, 295 Mich App 165, 174-175; 814 NW2d 295 (2012), citing MCL 750.520b(1)(c). The underlying felony supporting Klyk's CSC I conviction was unlawful imprisonment. This Court has recognized that MCL 750.520b(1)(c) does not require "that the sex act occur during the commission of" the other felony, but rather, that there was "a direct interrelationship" between the sexual penetration and the other felony. *People v Waltonen*, 272 Mich App 678, 692-693; 728 NW2d 881 (2006). In other words, "there must be a sufficient nexus between the underlying felony and the sexual penetration . . . ." *Id*. at 691.

The record shows that there existed a sufficient nexus between the sexual penetration and Klyk's unlawful imprisonment of NG. Klyk sat on NG's chest and pinned her arms to the bed before he slapped and strangled her. He then tied her left wrist to the bed using a strap, hit her with the broken clip of the right strap, and strangled her again. Thereafter, he untied her left wrist and directed her to lie at the side of the bed before he sexually assaulted her. Contrary to Klyk's argument that his actions were separate, distinct acts, they constituted "a continuum of interrelated events." See *id*. at 693. NG testified that she cried during the incident, told Klyk to stop, and did not feel free to leave. She also testified that she feared that Klyk would hurt her or stop her if she tried to leave. NG left the house as quickly as she could when Klyk left her alone in the kitchen.

-4-

She ran to her truck while wearing only a sweatshirt and drove away. Because the evidence established a direct interrelationship between the unlawful imprisonment and sexual penetration, the prosecutor presented sufficient evidence to sustain Klyk's CSC I conviction.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney