# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

FREDERICK WILLIAM CORDS, JR.,

       Defendant-Appellant.

UNPUBLISHED
May 22, 2018

No. 335865
Charlevoix Circuit Court
LC No. 15-009612-FH

Before: METER, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of illegally obtaining $50,000 or more, but less than $100,000, from a vulnerable adult in violation of MCL 750.174a(6)(a). Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 10 to 20 years' imprisonment. Defendant appeals as of right. We affirm.

## I. FACTS

The victim, Merlin Dwaine Roberts, was in his eighties when he met defendant in 2012. The two became friends, and defendant eventually began to ask Roberts for money, claiming that it was to keep his electricity, heat, or cellular telephone running, or for other various reasons. From 2012 to 2014, Roberts gifted and loaned defendant substantial sums of money using several methods of transfer. Defendant claimed that he would pay Roberts back, but largely failed to do so.

At the time, Roberts lived alone. Roberts was able to drive and cook for himself, and led a "fairly independent" lifestyle. He had an ATM card and knew how to use it with the associated PIN number. Roberts initially testified that he preferred to withdraw cash from his bank account by visiting an ATM, typically at least once per day, but later stated that he would ordinarily go directly to the bank to obtain cash. Roberts's daughter, Tamara Guilbault, testified that her father preferred to visit the bank rather than to incur the fees associated with using an ATM. Roberts also stated that he had made balance inquiries on his account in the past, though Guilbault indicated that he was not in the habit of doing so. During the time Roberts was involved with defendant, 25 balance inquiries were made on his account.

-1-

On occasion, Roberts would write checks to "cash" when he needed money for personal items. In the pertinent period, 20 checks were made out to "cash," totaling $8,360. Four of the checks were for withdrawals in excess of $1,000, an amount of money Guilbault did not know her father to carry. Receipts for funds withdrawn without a check over the course of Roberts's relationship with defendant totaled $8,465. Roberts also made out a number of large checks directly to defendant, totaling $37,100. Additional checks were written to defendant's son in the amount of $12,500.

More than once, defendant would come to Roberts's house at 10:00 to 11:00 p.m., banging on the door or window to request that they go to an ATM. When Roberts would let defendant into the house, defendant would not leave until Roberts turned over his debit card, despite any objections. Defendant was also able to convince Roberts to reveal the associated PIN number. Defendant sometimes accompanied Roberts to ATM locations. Other times, defendant would visit an ATM alone with Roberts's card and PIN number. An exhibit established that, not accounting for overdraft fees and balance-inquiry fees, ATM withdrawals from 2012 through 2014 amounted to $24,394.50. No ATM withdrawals were made in 2010 or 2011.

Roberts came into an inheritance of $82,172.42. Within one month, his account balance was reduced to $4.65 as a result of several ATM withdrawals, with multiple ATM withdrawals sometimes being made in the same day.

Defendant asked Roberts to accompany him to Kalkaska to purchase a truck. Defendant falsely identified Roberts as his grandfather when speaking to the dealer. Roberts provided a $300 down payment and obtained a loan for $17,000 in his own name to facilitate payment for the truck. Defendant ultimately made only two payments on the loan.

In July 2014, Roberts contacted Guilbault to request financial assistance. This had never happened before. Guilbault accompanied her father to the bank and learned that he had incurred several overdrafts. Collection agencies and creditors were calling Roberts. Guilbault could not reconcile Roberts's expenses with her understanding of his financial habits.

Around July 2014, Guilbault was added to Roberts's account. Roberts was issued a new debit card and there were no further problems with the account. Guilbault did not learn of defendant until later, when Roberts called Guilbault again, asking for $75 for defendant. Defendant was told to direct future requests for money to Guilbault, and Roberts stopped answering defendant's calls. Guilbault arranged for the repossession of the truck that Roberts helped defendant purchase in order to satisfy the remaining loan balance. No further ATM withdrawals were made from June 2014 through the entirety of 2016.

A services specialist for the Adult Protective Services Division of the Department of Health and Human Services (DHHS) was made aware of concerns that defendant was financially exploiting Roberts. When she met Roberts, he appeared to be confused about his financial circumstances. Because of his advanced age, the services specialist determined that Roberts was a "vulnerable adult." However, she conceded that Roberts appeared to be able to function independently in other areas (i.e., Roberts could drive, prepare his own lunches, go out to eat for breakfast and dinner). She also believed that Roberts was capable of making gifts and loans of

money. The services specialist notified the police, who began a criminal investigation into defendant's conduct. During an interview with the police, defendant admitted to owing Roberts $16,000 to $17,000 for the purchase of the truck, and $14,000 to $15,000 in cash. Defendant later claimed that he had borrowed approximately $30,000 from Roberts over the course of their relationship, and had paid back nearly half.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that he was denied his constitutional right to due process because the jury rendered a guilty verdict without sufficient evidence that Roberts was a "vulnerable adult" under MCL 750.145m(u)(*i*). We disagree. This Court reviews de novo a defendant's assertion that the evidence was insufficient to support his conviction. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010).

Due process requires that a criminal defendant's conviction be sustained by sufficient evidence. *Id*. at 177 n 1. When reviewing the sufficiency of evidence, an appellate court reviews the evidence in the light most favorable to the prosecution to determine whether a rational jury could have found that the elements of the crime were proven beyond a reasonable doubt. *People v Cameron*, 291 Mich App 599, 613; 806 NW2d 371 (2011). In applying this standard,

> [an appellate court] must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact . . . . Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. [*People v Hardiman*, 466 Mich 417, 431; 646 NW2d 158 (2002) (quotation marks and citations omitted).]

Under MCL 750.174a(1), "[a] person shall not through fraud, deceit, misrepresentation, coercion, or unjust enrichment obtain or use or attempt to obtain or use a vulnerable adult's money or property to directly or indirectly benefit that person knowing or having reason to know the vulnerable adult is a vulnerable adult." Of particular import in this case, MCL 750.174a(6)(a) criminalizes a defendant's conduct when "[t]he money or property used or obtained, or attempted to be used or obtained, has a value of $50,000.00 or more but less than $100,000.00." MCL 750.145m(u)(*i*) defines "vulnerable adult" to mean, in pertinent part, "[a]n individual age 18 or over who, because of age . . . requires supervision or personal care or lacks the personal and social skills required to live independently."

It was established that Roberts was approximately 83 years old when defendant first entered his life. There was ample evidence to establish Roberts's vulnerability due to his advanced age. The services specialist expressly stated that, because of his age, Roberts was a vulnerable adult. She also testified that Roberts appeared confused about his finances. Indeed, the record of Roberts's testimony reveals that he appeared to have difficulty articulating his thoughts and staying focused on questions. His testimony was scattered and on multiple occasions he needed to have questions repeated or explained, though this may have been at least

partly due to his hearing impairment. Further, Roberts allowed defendant—whom the evidence did not establish as a long-time friend or business partner—to accompany him to an ATM, to enter his house in the late hours of the night, and to use his ATM card and associated PIN number without supervision. From these facts, a rational jury could have found that Roberts was "vulnerable" under MCL 750.145m(u)(*i*) beyond a reasonable doubt. See *Cameron*, 291 Mich App at 613.

It is true that Roberts was able to live independently on his own from 2012 to 2014, otherwise functioned appropriately without assistance, and was even capable of making gifts or loans of money. However, these facts do not negate the validity of the jury's verdict. That Roberts was able to make gifts and loans does not inherently mean that he was incapable of going too far in doing so, requiring some supervision over his money. Further, the pertinent definition of a "vulnerable adult" is "[a]n individual age 18 or over who, because of age . . . requires supervision *or* personal care *or* lacks the personal and social skills required to live independently." MCL 750.145m(u)(*i*) (emphasis added). "The word 'or' is a disjunctive term indicating a choice between alternatives." *Stock Bldg Supply, LLC v Crosswinds Communities, Inc*, 317 Mich App 189, 204; 893 NW2d 165 (2016) (quotation marks and citations omitted). Thus, it was enough to sustain defendant's conviction that the evidence demonstrated Roberts's need for financial supervision, regardless of his ability to live independently. See MCL 750.145m(u)(*i*).

Defendant also argues that, even if Roberts was vulnerable when the services specialist examined him, there was no evidence to demonstrate that Roberts was vulnerable for the entire time that defendant knew him. The services specialist could not definitively ascertain when Roberts became vulnerable. She did not believe, however, that his vulnerability had had a "sudden onset." A jury is permitted to make logical and reasonable inferences in fulfilling its role as the finder of fact. *Hardiman*, 466 Mich at 427. When taken in the context of the evidence discussed above, the jury could have determined that Roberts had become vulnerable in his advanced age, requiring financial supervision by 2012, if not earlier.

Defendant next contends that Roberts could not have been vulnerable when he made gifts and loans to defendant if he was not also vulnerable when he made gifts to others. This argument is without merit. Evidence was presented that Roberts gifted over $18,000 to his friend of 40 years, Charlene Schreiber, and her son. Roberts also funded a $25,000 line of credit for Schreiber's son, which he used when he started a business. However, the facts surrounding these gifts were distinguishable. Roberts expressly stated that he did not expect the Schreibers to pay him back, and that he considered them to be close family members. Moreover, no evidence was presented to show that Roberts's generosity toward the Schreibers completely depleted his funds over the course of 40 years of friendship.

Though perhaps the jury *could* have determined that Roberts was not "vulnerable" under the statute, it is not for an appellate court to adopt inferences that the jury has found unpersuasive. See *id*. at 430-431. Logical and reasonable inferences existed to allow the jury to conclude that Roberts was "vulnerable," and so defendant cannot claim that the evidence was insufficient in this regard. See *id*. at 427.

Defendant next argues that evidence was insufficient for the jury to determine that defendant knew or should have known that Roberts was vulnerable. Because it can be difficult to prove a criminal defendant's knowledge or other state of mind, "minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). Such evidence includes the defendant's actions. *Id*. at 604. In addition, when knowledge is an element of the offense, it inherently includes actual and constructive knowledge. *Id*.

The record does not disclose a great deal regarding how defendant came into Roberts's life. However, there was ample evidence that, once defendant was acquainted with Roberts, he became increasingly aware of Roberts's vulnerability. Defendant went to Roberts's home unannounced in the late hours of the evening, banging on the door and windows to request that the two go to an ATM. At some point, Roberts was convinced to allow defendant the use of his ATM card and associated PIN number. From there, defendant was able to make withdrawals from Roberts's account without Roberts even being present. Further, when Roberts came into an inheritance, withdrawals from his account became more frequent and in greater amounts such that the funds were depleted within one month. This behavior suggests that defendant knew when Roberts was susceptible to acting against his own financial interests and when Roberts had greater sums of money in his account. Indeed, a colorable argument could be made that the fact that Roberts even agreed to allow defendant the use of his ATM card and PIN number should have put defendant on notice that Roberts was a vulnerable adult, incapable of making financially sound decisions.

Ultimately, the evidence showed that defendant may have been responsible for taking up to $8,360 in the form of checks made to "cash," $8,465 in withdrawals directly from Roberts's account without the use of a check, $17,300 for the purchase of the truck—although an unknown amount of this loan was satisfied when the truck was repossessed and sold—$24,394.50 in ATM withdrawals (not including overdraft fees and balance-inquiry fees), $37,100 in checks made to defendant, and $12,500 in checks made to defendant's son. Defendant may have also taken nearly $82,172.42 when Roberts came into his inheritance, though it is unclear how much this overlapped with the other amounts. Regardless, the amount that defendant was able to take from Roberts without reimbursement completely wiped out Roberts's funds. Even if the vast sum of money, itself, was not enough to establish that defendant knew or should have known that Roberts was vulnerable, evidence was put forward to show that defendant was monitoring Roberts's account with frequent balance inquiries. Accordingly, the jury could have reasonably inferred that defendant was aware of the damage he was causing Roberts, and that a non-vulnerable adult victim would not have allowed this to continue.

Defendant also argues that he could not have known that Roberts was vulnerable because Roberts was deemed capable of making loans and gifts of money. Defendant highlights the fact that Roberts's own daughter was not aware that he was vulnerable until at least 2014. Defendant cannot prevail on these assertions. The services specialist expressly indicated that Roberts was a vulnerable adult. That Roberts was able to make loans and gifts and to live independently does not inherently mean he could not have been vulnerable. Moreover, Guilbault was not asked for help until 2014, and so she had no reason to know of his vulnerability until then. Also, the text of MCL 750.174a(1) is only concerned with whether the defendant knew or should have known

about the victim's vulnerability; accordingly, whether anyone besides defendant had knowledge is of little consequence here.

Defendant next asserts that there was insufficient evidence for the jury to determine that defendant defrauded Roberts of $50,000 or more but less than $100,000. Accounting for the checks made payable to defendant and his son, defendant received $49,600 from Roberts. While defendant's son was not charged in this case, the jury could have reasonably and logically inferred that defendant induced Roberts to write checks to his son in furtherance of the crime. See *Hardiman*, 466 Mich at 427. No evidence was presented to indicate that Roberts made those checks to defendant's son of his own volition, absent defendant's exploitation of his vulnerability. This leaves only $400 for defendant to reach the threshold established by MCL 750.174a(6)(a). Roberts paid $300 as a down payment for defendant's truck, and also took out a $17,000 loan to finance the purchase. At least some of the loan was satisfied when the truck was repossessed and sold, though the exact amount remaining on the loan was never established. It is also unclear whether this satisfied both the loan and the down payment or merely the loan. Defendant told the police that he owed Roberts at least $16,000 for the truck, but this may have been alleviated by the repossession.

In any case, there was also evidence that from 2012 to 2014, $24,394.50 was withdrawn from Roberts's account from various ATM locations. The jury could reasonably have attributed many of the ATM withdrawals to defendant, because Guilbault testified that Roberts typically avoided making such withdrawals for fear of incurring the associated fees. Given Roberts's inconsistent and somewhat scattered testimony and Guilbault's assertion that no ATM withdrawals were made before 2012 or after June 2014, it would have been reasonable for the jury to conclude that most—if not all—of the ATM withdrawals from Roberts's account were made by or for defendant. Defendant contends that the withdrawals were for Roberts himself, but, as stated above, it is not for this Court to adopt inferences that the jury has found unpersuasive. See *Hardiman*, 466 Mich at 430-431. Appellate courts must, instead, defer to the jury on issues of the weight to be assigned to trial testimony and the credibility of witnesses. *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008).

Finally, evidence was presented of $8,360 in the form of checks made to "cash" and $8,465 in withdrawals directly from Roberts's account without the use of a check. Moreover, Roberts's $82,172.42 inheritance was reduced to $4.65 in the course of one month. The jury could have reasonably attributed the disappearance of some or all of this money to defendant's conduct. Again, it is inappropriate for this Court to second-guess the jurors' assessment of the weight given to the evidence. *Id*. Accordingly, sufficient evidence was produced for the jury to find that defendant defrauded Roberts, a "vulnerable adult," of $50,000 or more but less than $100,000.

Defendant argues that any amounts other than the checks written to defendant were impermissibly speculative. "[A]n inference cannot be based upon evidence which is uncertain or speculative or which raises merely a conjecture or possibility. This, of course, implicitly allows inferences that are logical and reasonable . . . ." *Hardiman*, 466 Mich at 427 (quotation marks and citation omitted). Moreover, in *Ykimoff v W A Foote Mem Hosp*, 285 Mich App 80, 88; 776 NW2d 114 (2009), the Court stated:

[A] conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [Quotation marks and citation omitted.]

As discussed above, there was substantial evidence that defendant defrauded Roberts of an amount in excess of $50,000. The jury would have been able to infer that a combination of the ATM and in-person bank withdrawals, the amount of Roberts's inheritance that was withdrawn within one month, and the checks made to defendant and his son were attributable to defendant's conduct. The jury did not need to resort to speculation or conjecture in order to find that the amount defendant took from Roberts met the statutory requirements of MCL 750.174a(6)(a).

## B. PROSECUTORIAL ERROR

Defendant next argues that the prosecution erred when, during its closing argument, it called defendant a "con man" or "confidence man"[1] before comparing defendant's relationship with Roberts to that of a predator of the Serengeti Plains and its old or sick prey. To preserve a claim of prosecutorial error, a defendant must timely and specifically object before the trial court, unless objection could not have cured the error. *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). In the instant case, defendant did not object to any of the prosecutor's comments made during closing arguments. Accordingly, the issue is unpreserved.

"Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *Id*. Plain error is error that is clear or obvious. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). To show that a plain error affected substantial rights, "there must be a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings." *Id*. at 356. The defendant bears the burden of persuasion on the issue of prejudice. See *id*. Reversal is only warranted when such error resulted in the conviction of an innocent defendant or when the error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." *Id*. at 355.

The pertinent question in reviewing claims of prosecutorial error is whether the prosecutor committed errors that deprived the defendant of a fair and impartial trial. *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). "Generally, [p]rosecutors are accorded great latitude regarding their arguments and conduct." *Id*. at 90 (quotation marks and citations omitted). They may argue the evidence and all reasonable inferences from the evidence. *People*

---

[1] He also alleges that the prosecutor called him a "bad man" during closing argument, but the record does not support this assertion.

*v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). A prosecutor may not appeal to the jury to sympathize with the victim. *Id.* at 237. However, the prosecutor need not speak in the "blandest of all possible terms." *People v Blevins*, 314 Mich App 339, 355; 886 NW2d 456 (2016) (quotation marks and citation omitted).

We note that in referring to defendant as a "con man," the phrase was directly related to the prosecutor's theory of the case and did not address defendant's criminal history. The term was reflective of the prosecution's theory that defendant exploited Roberts's vulnerability by gaining his confidence and obtaining a large sum of money from his account, a theory that was supported by the evidence.

Defendant also contends that the prosecutor committed misconduct by calling defendant a "predator." The Sixth Circuit has concluded that even repeated use of the term "predator" during a prosecutor's closing arguments may not deprive a party of a fair trial. *Byrd v Collins*, 209 F3d 486, 536 (CA 6, 2000). Overall, the record shows that the prosecutor was arguing a reasonable inference from the evidence. *Unger*, 278 Mich App at 236. The mere use of the term "predator" does not persuade us that reversal is warranted.

Defendant asserts that the prosecutor improperly appealed to the jurors' sympathies with the "predator and prey" comment. While the prosecution made a colorful analogy, there is no indication that he argued facts that were not in evidence or that the comment mischaracterized the evidence. The analogy appeared to simply reflect the prosecution's theory of the case on the basis of the evidence presented. Roberts was at an advanced age when he first met defendant, and the jury was able to witness firsthand his scattered, inarticulate testimony. There was a great deal of evidence suggesting that defendant took advantage of Roberts's vulnerable status to defraud him of over $50,000. Characterizations of this kind do not constitute prosecutorial error when they are based on facts in evidence and the reasonable inferences arising therefrom. See *id*. Further, defendant has failed to show that, if the prosecution's analogy did constitute prosecutorial error, it resulted in the conviction of an innocent man or "seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." See *Jones*, 468 Mich at 355.

Defendant also argues that the prosecution improperly vouched for the credibility of its witnesses and implied that it had some special knowledge of the facts by stating that

> if the Department of Human Services looked at Jack's financials and condition at the time and determined that he was not in need of Adult Protective Services that would have been just as wrong as [an umpire incorrectly calling a baseball pitch]. And if that happened, the State Police wouldn't have gotten involved. There would never have been an investigation. We wouldn't be here talking about it. But DHS did make the right call. They called a strike a strike. They determined that Jack Roberts was vulnerable, in need of Protective Services, and so here we are.

"A prosecutor may not vouch for the credibility of witnesses by claiming some special knowledge with respect to their truthfulness." *People v McGhee*, 268 Mich App 600, 630; 709 NW2d 595 (2005). Likewise, the prosecutor may not suggest that the government, in general,

has any special knowledge of the facts. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). A prosecutor may, however, argue that a witness should be believed on the basis of the facts in evidence. *McGhee*, 268 Mich App at 630. In this case, the prosecution did not suggest that it had some special knowledge of the facts or that the DHHS or Michigan State Police had any such knowledge. Rather, the prosecution merely provided an accurate summary of the procedure that led to these proceedings and indicated that, based on the facts, the DHHS made the correct decision regarding the case. It is true that the police became involved in the case because of the service specialist's referral, and that a criminal investigation followed. However, this does not inherently imply that these government entities had *special knowledge* of defendant's guilt beyond the facts as recapped by the prosecution. At any rate, even if the prosecution's argument was improper, defendant has not shown that the error would have resulted in the conviction of an innocent man or "seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." See *Jones*, 468 Mich at 355.

Moreover, the trial court instructed the jury only to consider appropriate evidence, and included specific warnings not to give any weight to arguments made by counsel. Defendant has not addressed why this did not cure any prejudicial effect. See *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Defendant has not demonstrated prosecutorial error warranting reversal and has not demonstrated any outcome-determinative error for purposes of his claim of ineffective assistance of counsel. See *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (discussing the standards for an ineffective-assistance claim).

## C. SCORING OF OFFENSE VARIABLES

Defendant argues, in a supplemental brief, that the trial court erred in assessing him 10 points for Offense Variable (OV) 14 and an additional 10 points for OV 19.[2] This Court reviews factual determinations regarding the scoring of OVs for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Such factual determinations must be supported by a preponderance of the evidence. *Id*. Clear error occurs "when the reviewing court is left with a definite and firm conviction that a mistake has been made." *Yono v Carlson*, 283 Mich App 567, 569; 770 NW2d 400 (2009) (quotation marks and citation omitted). The application of the facts to the law is a matter of statutory interpretation, which the Court reviews de novo. *Hardy*, 494 Mich at 438.

MCL 777.49(c) states that OV 19 is to be assessed 10 points when "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice." This Court has held that the plain meaning of the phrase "interfere with the administration of justice" for purposes of OV 19 is "to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013). The Court has interpreted this language broadly, stating that it contemplates " '[c]onduct that occurs before criminal charges are filed,' acts that

---

[2] Defendant raised the OV issues in a motion to remand filed in this Court.

constitute obstruction of justice, and acts that do not 'necessarily rise to the level of a chargeable offense . . . .' " *Id.*, quoting *People v Barbee*, 470 Mich 283, 287-288; 681 NW2d 348 (2004). Conduct that has been found to constitute an interference or attempted interference with the administration of justice includes:

> providing a false name to the police, threatening or intimidating a victim or witness, telling a victim or witness not to disclose the defendant's conduct, fleeing from police contrary to an order to freeze, attempting to deceive the police during an investigation, interfering with the efforts of store personnel to prevent a thief from leaving the premises without paying for store property, and committing perjury in a court proceeding. [*Hershey*, 303 Mich App at 344.]

The presentence investigation report states the following regarding a restitution hearing held after defendant's plea:[3]

> The defendant's own testimony in court at the evidentiary hearing was in regards to a specific transaction in which $11,400 was withdrawn by the victim, with the defendant stating he received $1,400 and the remaining $10,000 was given to the victim's girlfriend. A letter from a Charlene Schreiber contradicts this testimony as being truthful or factual. Mrs. Schreiber in her letter reflects that she did meet the defendant on that occasion, but she was not the recipient of any monies from the victim on that occasion. The defendant testified to this occurring in an attempt to account for the monies and lessening his own culpability . . . . [I]n the [courtroom] environment [this] is clearly an attempt to interfere with the administration of justice.

The record adequately supports this recitation of the circumstances. At the restitution hearing, defendant testified, regarding the $11,400 in question, that Roberts "took" $10,000 in cash from this sum "to Charlene" and defendant retained $1,400. Defendant testified that Roberts was "fronting a lot of money to Charlene" and "didn't want people to know about it." In her letter, Schreiber stated that she never received large sums of cash from Roberts, "either directly from him or through a third party." "It is undisputed that perjury provides a basis for scoring OV 19," *People v Underwood*, 278 Mich App 334, 338; 750 NW2d 612 (2008), even, in fact, in a prosecution for perjury itself, *id*. at 339-340. Defendant argued below that he did not lie at the hearing because his testimony did not encompass an actual observation of Roberts handing the money to Schreiber. Given the standard of review, however, see *Hardy*, 494 Mich at 438, and given that OV 19 can be scored based on conduct not necessarily rising to the level of a chargeable offense, see *Hershey*, 303 Mich App at 343, there is no basis for reversal. We note, too, that although the testimony in question occurred after defendant's later-withdrawn plea and before trial, it nonetheless related to the conduct forming the basis for the instant conviction. There was adequate evidence that defendant attempted to interfere with the administration of

---

[3] He later withdrew the plea, which is why the case proceeded to trial.

justice in connection with the unlawful acts forming the basis of his conviction. Accordingly, we find no basis for overturning the scoring of OV 19.

Violations of MCL 750.174a(6)(a) are class C felonies. MCL 777.16i. Defendant was initially assessed 80 points under the applicable prior record variables (PRVs) and 45 points under the pertinent OVs. If OVs were assessed incorrectly, but the guidelines range is not altered as a result, resentencing is not required. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). Even assuming, without deciding, that OV 14 should have been assessed zero points instead of 10 points, this scoring change would not alter the guidelines range. Indeed, without the 10 points stemming from the scoring of OV 14, and applying the fourth-offense habitual offender enhancement, see MCL 777.21(3)(c), the guidelines would remain at 50 to 200 months. MCL 777.64. As such, resentencing is not required.

Affirmed.

/s/ Patrick M. Meter
/s/ Michael F. Gadola
/s/ Jonathan Tukel

-11-