*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 30, 2019

Plaintiff-Appellee,

v

No. 343000
Berrien Circuit Court
LC No. 2017-001739-FH

BARRY LARON DOOLITTLE,

Defendant-Appellant.

Before: SHAPIRO, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

Defendant, Barry Laron Doolittle, appeals as of right his jury trial conviction of assault with intent to do great bodily harm less than murder, in violation of MCL 750.84. The trial court sentenced defendant to 96 to 240 months' imprisonment as a third-offense habitual offender pursuant to MCL 769.11. We affirm.

## I. BASIC FACTS

According to the evidence presented at trial, the victim lived in a multistory apartment building in Benton Harbor, Michigan. On May 4, 2017, at around 1:30 p.m., he left his ninth-floor residence to go to the grocery store and was using his cell phone to text. While looking down at his phone and approaching the elevator, the victim was startled by defendant, who reached out to grab him. The victim tried to turn and run in the opposite direction, but defendant came behind "and grabbed [him] and yanked [him] back towards him." The victim did not know defendant, but he had seen him several times in the building and, two weeks before, defendant had accosted the victim and threatened him.[1] Defendant "kept ranting and raving about different

---

[1] The victim could not explain why defendant threatened him, testifying that the "weirdest thing" was that he did not know defendant at all and had never spoken to him. The victim testified that he had talked to defendant's sister about the prior episode, and she gave corroborating testimony at trial regarding this conversation. Defendant's mother, who also lived in the building, testified

stuff," particularly "about a white woman," a topic the victim testified he knew nothing about. Defendant slammed the victim up against a wall repeatedly, using such force and intensity that, when the victim's head hit a railing banister mounted to the wall, "it broke completely out of the wall." Others in the elevator bank area stopped and watched the altercation. Some tried unsuccessfully to tell defendant to stop. The victim fell to the ground, and defendant "just kept pounding on [him]," using both fists and aiming mostly at the victim's head, but also landing blows on the back of his neck and the sides of his arms. The victim testified that he did not strike back in any way and, for the length of the attack, "balled up in like a fetus position" trying to protect himself. While the victim tried to curl up to block defendant's blows, defendant "would stop for seconds at a time and then start back up again." Although bystanders said, "you're gonna kill him. You need to stop, you're gonna kill him," defendant did not stop and said, in response, that "he didn't give a damn." Another tenant at the apartment building corroborated the victim's testimony, explaining to the jury that the "beating" lasted for more than 10 minutes, was "real bad," and that the victim was "just laying [sic] there," with his head and knees drawn toward his chest. The witness confirmed that defendant repeatedly said he intended to kill the victim.

At some point, the police arrived. A Benton Harbor Department of Public Safety police officer testified that he first observed defendant walking out of the elevator, and that defendant said to him, unprovoked, "I'm the one you're looking for." Defendant also identified himself by name. Defendant was "breathing heavily" and the officer recalled seeing "some blood on his hands." The officer placed defendant under arrest and proceeded to the ninth floor. There, he observed the victim "kind of like sitting and laying on the floor," "blood on the floor," "a piece of wood kind of hanging down from one of the ledges." The victim was bleeding from cuts on his right forearm and forehead, and the back of his head was swollen. The officer testified that the railing or banister board that had been broken during the assault remained partially attached to the wall on one side. Before going to the hospital, the victim specifically identified defendant as his assailant. Further confirming his identity as the culprit, after the victim identified defendant to the police officers, defendant stated aloud, "I beat your ass," and "How did you like that ass whipping, you fagging motherfucker?"

At trial, the prosecution admitted video surveillance footage of the assault, portions of the responding officer's body camera video footage, and several photographs substantiating injuries to the victim's head and arms and the damaged railing. The emergency medicine doctor who treated the victim could not directly recall him but testified more generally that when a patient has been struck in the face multiple times, her first concern is life-threatening or sight-threatening injury, such as bleeds inside the brain, fractures to the face, or difficulty moving one's eyes. She explained that multiple hits would increase the possibility of intracranial, or

---

about a letter she had received from the apartment manager right before the offense at issue that indicated defendant was not allowed to stay in her apartment or be in the building. After defendant read the letter, he left her apartment in anger, saying, "I'm coming, man." This prompted defendant's mother to call the police, concerned that defendant would hurt himself or someone else.

brain, injury. Such an injury could lead to loss of mobility, paralysis, loss of sight, and other mental impairment. The doctor explained that while the victim's CAT scan revealed "no acute intracranial abnormality," it did show "significant scalp swelling at the left frontal scalp and right parietal occipital scalp without underlying fracture," which meant bruising on his scalp. The doctor gave the victim some Tylenol for his headache and treatment instructions for symptoms relating to a possible concussion.

Defendant did not testify and offered no evidence in his defense. On the sole count of assault with the intent to do great bodily harm less than murder, the jury quickly returned a guilty verdict. Defendant now appeals.

## II. ANALYSIS

On appeal, defendant raises three allegations of error: (1) there was insufficient evidence to support the jury's verdict; (2) the trial court erred in scoring Offense Variable 7 (OV 7) at 50 points; and (3) there was insufficient evidence to support the trial court's restitution award. We will address each argument in turn.

## A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence presented at trial did not support a finding that he had the intent to do great bodily harm less than murder because one witness testified that defendant "wasn't punching real 'hard' hard, he just had his arm all the way back . . . ," there was no evidence that defendant kicked the victim or hit him with the railing that dislodged, and the victim's injuries were not severe. We disagree.

This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

> [W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. [*People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992).]

Circumstantial evidence, including reasonable inferences arising from the evidence, is sufficient proof of the elements of a crime. *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016) (quotation marks and citation omitted). "This Court has defined the intent to do great bodily harm as an intent to do serious injury of an aggravated nature." *Id*. (quotation

marks and citation omitted). "No actual physical injury is required for the elements of the crime to be established." *People v Harrington*, 194 Mich App 424, 430; 487 NW2d 479 (1992).

Review of the record reveals that the evidence presented at trial unequivocally established the elements necessary to sustain the jury's verdict. Defendant punched the victim 31 times, mostly in the head, all the while repeatedly exclaiming that he intended to kill the victim and did not care whether the victim died, ignoring the pleas of the victim and several bystanders. The assault lasted upwards of 10 minutes, and for much if not all of that time, the victim remained curled up in a fetal position, attempting to protect himself from the blows. When slamming the victim into the wall, defendant used enough force to break a railing or banister fixture off the wall, and another witness testified that the beating was "real bad." In reaching our conclusion, we summarily reject defendant's argument that he did not have the necessary intent because he did not punch "hard," as evidenced by the extent of the victim's injuries, nor do we deem relevant defendant's focus on the potential means of assault he did not take, such as kicking the victim or using the broken wall railing as a weapon. That defendant could have resorted to more severe actions does not negate or reduce the criminality of the actions to which he did resort, which we conclude were wholly sufficient to sustain defendant's conviction.

## B. OFFENSE VARIABLE 7

Defendant next contends that the evidence of his punching the victim 31 times, which one witness described as "not real hard," and his stopping and resting in between blows, when taken in consideration with the fact that he did not kick the victim or hit him with readily available objects, is insufficient to support the assessment of 50 points for OV 7. He also takes issue with the trial court's failure to address whether the conduct was intended to make the victim's fear or anxiety greater by a considerable amount. We conclude that the trial court did not err in assessing 50 points under OV 7 on account of defendant's treatment of the victim with excessive brutality.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

OV 7 of the sentencing guidelines relates to "aggravated physical abuse." See MCL 777.37(1). MCL 777.37 provides, in pertinent part:

(1) Offense variable 7 is aggravated physical abuse. Score offense variable 7 by determining which of the following apply and by assigning the number of points attributable to the 1 that has the highest number of points:

(a) a victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ...................................................... 50 points

> (b) no victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ....................................................... 0 points

"A trial court can properly assess 50 points under OV 7 if it finds that a defendant's conduct falls under one of the four categories of conduct listed in subsection (1)(a)." *Hardy*, 494 Mich at 439-440. The trial court "must score OV 7 at 50 points if the offender treated the victim with 'excessive brutality.' " *People v Steanhouse (On Remand)*, 322 Mich App 233, 240; 911 NW2d 253 (2017). "For purposes of OV 7, excessive brutality means savagery or cruelty beyond even the 'usual' brutality of a crime." *People v Rosa*, 322 Mich App 726, 743; 913 NW2d 392 (2018) (quotation marks and citation omitted). "OV 7 is scored on the basis of defendant's conduct and his intent, not whether the victim felt sufficiently threatened." *People v Urban*, 321 Mich App 198, 217; 908 NW2d 564 (2017).

The evidence demonstrated that defendant struck the victim 31 times, aiming his blows primarily at the victim's head. It also demonstrated that defendant took his time, perhaps as long as 10 minutes, and "stopped and rested for a time" in between blows after apparently exhausting himself. The fact that the victim escaped serious injury does not affect the finding of excessive brutality. See *People v Kegler*, 268 Mich App 187, 191-192; 706 NW2d 744 (2005). Furthermore, during the assault, defendant repeatedly exclaimed that he intended to kill the victim and that he did not care whether the victim died, ignoring the pleas of the victim and onlookers that the victim was in serious danger. Respecting the relative amount of force, while defendant could have, perhaps, used more force, he did in fact use an amount of force sufficient to partially break off a wall railing when the victim's head struck it. We reject defendant's suggestion that the trial court erred because he could have been *more* cruel or savage by then using the broken wall railing as a weapon.

The fact that the trial court did not address whether defendant's conduct was designed or intended to substantially increase the victim's fear or anxiety during the offense is not error. This is not a relevant standard for assessing whether defendant treated the victim with excessive brutality. Our Supreme Court in *Hardy* recognized four *separate and alternative* bases for assessing points under OV 7, and further held that the Legislature's reference to conduct designed "to substantially increase the fear and anxiety a victim suffered during the offense" is "an independent clause that has an independent meaning." See *Hardy*, 494 Mich at 441. Consequently, defendant's purported intentions with respect to the victim's fear or anxiety have no bearing on whether defendant treated the victim with sadism, torture, or excessive brutality except to the extent evidence of such intention also works to individually satisfy one or more of those separate categories of qualifying conduct under OV 7. Defendant's conduct satisfied the standard for excessive brutality, and the trial court did not clearly err in determining that the conduct was cruel and savage "beyond even the 'usual' brutality of a crime." *Rosa*, 322 Mich App at 743.[2]

---

[2] In addition to excessive brutality, the trial court also held that defendant's conduct constituted sadism. MCL 777.37(c) expressly defines sadism as "conduct that subjects a victim to extreme

-5-

## C. RESTITUTION

Finally, defendant argues that the trial court erred in ordering $268 in restitution for damage to the victim's cell phone because "there was no evidence presented which showed that the phone had been damaged." We disagree.

"This Court generally reviews an order of restitution for an abuse of discretion." *People v Raisbeck*, 312 Mich App 759, 768; 882 NW2d 161 (2015) (quotation marks and citation omitted). "The trial court's findings of fact are reviewed for clear error." *People v Fawaz*, 299 Mich App 55, 64; 829 NW2d 259 (2012). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *Id*. at 60 (quotation marks and citation omitted).

Pursuant to MCL 780.766(2), when sentencing a defendant convicted of a crime, "the court shall order . . . that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction . . . ." When the crime results in damage to or loss or destruction of the victim's property, the order of restitution shall require the defendant to

> pay an amount equal to the greater of subparagraph (*i*) or (*ii*), less the value, determined as of the date the property is returned, of that property or any part of the property that is returned:
>
> (*i*) The fair market value of the property on the date of the damage, loss, or destruction. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value.
>
> (*ii*) The fair market value of the property on the date of sentencing. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value. [MCL 780.766(3)(b).]

Under the Crime Victim's Rights Act (CVRA), restitution to crime victims is mandatory, not discretionary. See *Fawaz*, 299 Mich App at 65. The prosecution bears the burden of proving the amount of restitution by a preponderance of the evidence. See MCL 780.767(4). Consistent with MCL 780.767(2) and (3), "[t]he PSIR may be used in making this showing." See *People v*

---

or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." Because we affirm the trial court's determination respecting excessive brutality, we need not address at length this alternative basis for the assessment of points under OV 7 except to state that no error occurred. We are satisfied that evidence that defendant punched the helpless victim 31 times, occasionally pausing to rest, ignored the express concerns of bystanders, and repeated an intention to kill and a general disregard for whether the victim died, supports the trial court's determination that defendant also treated the victim with sadism.

*Bryant*, 319 Mich App 207, 212; 900 NW2d 360 (2017). Moreover, "[t]here is a presumption that the information contained in the PSIR is accurate unless the defendant raises an effective challenge." *People v Lloyd*, 284 Mich App 703, 705; 774 NW2d 347 (2009).

We are satisfied that the trial court did not err in awarding $268 in restitution. Defendant's presentence investigation report, which the trial court properly relied on during sentencing, reflected that the altercation "left the victim with a broken cell phone," among other physical and emotional injuries. Moreover, the victim specifically requested $268 in restitution for the damaged cell phone as part of his victim impact statement and restitution request worksheet. See *Bryant*, 319 Mich App at 212. While defendant, at sentencing, challenged the existence of any damage to the victim's cell phone, between the victim's testimony concerning his cell phone use, the security video showing the cell phone falling to the ground, and the victim's assertion of damage in the amount of $268, there was sufficient evidence for the trial court to sustain the restitution award. We conclude that defendant's failure to raise any challenge as to the amount of the damage sustained or the value of the cell phone at the sentencing hearing forecloses appellate relief. "While defendant now requests a remand for an evidentiary hearing, it was incumbent on the defendant to make a proper objection and request an evidentiary hearing." *People v Bowling*, 299 Mich App 552, 564; 830 NW2d 800 (2013) (quotation marks and citation omitted). Absent any objection to the accuracy of the amount provided by the victim, "the trial court was entitled to rely on the accuracy of the amounts provided in the presentence investigation report." *Id*.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Jane M. Beckering