*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSEPH ROBERT BIRCKELBAW,

        Defendant-Appellant.

UNPUBLISHED
June 05, 2026
8:48 AM

No. 372230
Oakland Circuit Court
LC No. 2021-277894-FC

Before: BAZZI, P.J., and RICK and MALDONADO, JJ.

PER CURIAM.

Defendant, Joseph Robert Birckelbaw, appeals by right his jury trial conviction of second-degree murder, MCL 750.317. Birckelbaw was sentenced to 16 to 40 years' imprisonment. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from the death of the victim, Todd Hall, on the evening of December 30, 2020. The incident occurred at Hall's home in Walled Lake, Michigan, where he lived with his two roommates, Birckelbaw and Raymond Champe. Hall's mother, Nancy Johnston, owned the condominium where Hall, Birckelbaw, and Champe lived at the time of the incident. Hall stayed in the master bedroom, Champe resided in the second bedroom, and Birckelbaw resided in the basement.

On the evening of the incident, Champe was watching television in his bedroom when he heard a commotion in the hallway. When he exited his room to see what was going on, he saw Hall coming out of his bedroom, holding a bloody cloth to this throat. Birckelbaw was also in the hallway and advised Champe to call 911 because Hall had been cut. During the 911 call, Birckelbaw stated that Hall attacked him with a knife, and that he was acting in self-defense when "the knife slit [Hall's] throat." While Hall remained alert until emergency responders arrived, he subsequently died of his injuries at the hospital. An autopsy conducted by Ljubisa Jovan Dragovic, M.D., noted the cause of death as sharp-force trauma to the neck, and the manner of death as homicide.

-1-

At trial, Birckelbaw objected to the trial court allowing Johnston to testify that she found a knife sheath in the basement of the condo two years after Hall's death, which was not recovered by police during the initial investigation. The trial court allowed the testimony. The primary issue at trial concerned whether Birckelbaw was acting in self-defense. Following a five-day jury trial, Birckelbaw was convicted and sentenced as noted above. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

Birckelbaw argues that there was insufficient evidence to support his second-degree murder conviction because the prosecution failed to disprove self-defense beyond a reasonable doubt. We disagree.

On appeal, a claim of insufficient evidence is reviewed de novo in the light most favorable to the prosecution. *People v Lowrey*, 342 Mich App 99, 122; 993 NW2d 62 (2022). This Court must "determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted). In making this determination, "this Court must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *Id*. Because of the difficulty of proving a defendant's knowledge or intent, "minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. at 619.

To prove the elements of second-degree murder, a prosecutor must show: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (quotation marks and citation omitted).[1] There are several methods of establishing the element of malice, including "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. The third method of establishing malice can also "be shown by the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *Id*. (quotation marks and citation omitted).

Addressing the prima facie elements in turn, it is undisputed in this case that Hall died. Further, the prosecution presented sufficient evidence that Hall's death was caused by Birckelbaw's actions. Dr. Dragovic testified that the cause of Hall's death was sharp-force trauma to the neck, and the manner of Hall's death was homicide because the injury was purposefully effectuated by another individual. DNA analysis strongly supported that Birckelbaw's hands and the knife contained DNA from both Birckelbaw and Hall. In the 911 call, Birckelbaw stated that

---

[1] This Court has recently clarified that " 'without justification or excuse' is not a true element of second-degree murder," and "[i]nstead, it is part of the 'cluster of ideas' about the act of murder that our Legislature adopted in 1846 by enacting the homicide statutes." *People v Spears*, 346 Mich App 494, 522; 13 NW3d 20 (2023).

Hall attacked him, so he had to defend himself, and that he was fighting Hall when "the knife slit his throat." Birckelbaw also told responding officer, Richard Lindquist, that Hall came after him with a knife, and in the struggle, "the knife just came across [Hall's] neck." Based on this evidence, a rational trier of fact could conclude beyond a reasonable doubt that Hall's death was caused by Birckelbaw's act of cutting his throat.

As for the *mens rea* requirement, Birckelbaw challenges whether the prosecution proved the element of malice beyond a reasonable doubt, arguing that evidence relating to the crime scene, his attempt to render aid to Hall, and the variations in his version of events "do not provide a basis for reasonable inferences regarding [Birckelbaw's] state of mind." Notably, "minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Kanaan*, 278 Mich App at 622. And here, the prosecution presented sufficient evidence from which a rational trier of fact could find that malice was established beyond a reasonable doubt.

Dr. Dragovic testified regarding the severity of Hall's injuries, noting that the sharp-force trauma severed the deep structures of his neck, including his muscles, veins, windpipe, and esophagus. There was also evidence that Hall's throat was cut at least three times based on the multiple "tails" extending from the left side of the wound. Dr. Dragovic noted a separate stab wound to the back of Hall's neck. Given the multiple attempts to cut Hall's neck and the additional stab wound, Dr. Dragovic strongly indicated that Hall's injuries were the result of a purposeful act. The severe and repeated nature of Hall's injuries alone could enable a rational trier of fact to conclude that Birckelbaw at least intended to create a very high risk of great bodily harm or death, knowing that death or great bodily harm was the probable result of the injuries he inflicted.

We also disagree with Birckelbaw's assertion that the jury could not draw reasonable inferences from his conflicting statements concerning Hall's death. Birckelbaw's initial statements to the 911 operator and Officer Lindquist indicated that Hall attacked him with a knife, and he cut Hall's throat with a knife while defending himself. However, in an interview with Detective Branden Jousma hours after the incident, Birckelbaw stated that Hall cut his own throat and Birckelbaw hurt himself while attempting to get the knife away from Hall. In subsequent jail calls between Birckelbaw and his girlfriend at the time, Amy Duffey, Birckelbaw maintained that Hall cut his own throat. In another jail call, Birckelbaw told his brother that Hall cut himself. A rational trier of fact could interpret Birckelbaw's conflicting statements as consciousness of his guilt. See *People v Unger*, 278 Mich App 210, 225; 749 NW2d 272 (2008) (concluding that a defendant's conflicting statements tended to establish a consciousness of guilt). To the extent that Birckelbaw challenges the weight attributed to his varying statements, "this Court must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses." *Bennett*, 290 Mich App at 472.

Birckelbaw's primary argument relates to the final element, whether there was a justification or excuse for Hall's death. He contends that the prosecution failed to disprove beyond a reasonable doubt that he acted in self-defense. This argument is similarly unavailing.[2]

At common law, self-defense may justify homicide "if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (quotation marks and citation omitted). "[O]nce the defendant injects the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist," the burden shifts to the prosecution to "disprov[e] the common law defense of self-defense beyond a reasonable doubt." *Id*. at 709-710. Self-defense is also codified by MCL 780.972, and the relevant provisions state:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972(1)(a).]

Notably, "the touchstone of *any* claim of self-defense, as a justification for homicide, is *necessity*." *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002).

The prosecution presented ample evidence from which a rational trier of fact could reject Birckelbaw's self-defense claim. When the incident occurred, Birckelbaw was five years younger and physically larger than Hall. And while Birckelbaw presented a character witness, Robert Collier, who testified that Hall had a propensity for violence and became aggressive when drinking alcohol, Champe stated that while Hall generally displayed some minor aggression while drunk, he did not get violent. This evidence tends to undercut the proposition that Birckelbaw reasonably feared for his life during the incident.

While Birckelbaw stated on the 911 call that Hall "had a knife too," Officer Lindquist did not discover any knife or sheath among Hall's belongings when he recovered them from the hospital. Further, despite Birckelbaw's claim of self-defense to Officer Lindquist, the physical evidence does not support Birckelbaw's characterization that "the knife just came across [Hall's] neck." As noted above, Dr. Dragovic's testimony demonstrates that Hall sustained multiple severe and repetitive injuries. Hall sustained a stab wound to the back of his neck, which was 1¾ inches deep and his throat was severed all the way to his esophagus. Further, the "different lines of extension of the sharp force into the skin" could not "be generated by one move," and the pattern

---

[2] Birckelbaw presents much of this argument by challenging specific statements that the prosecution made during closing argument. We address his specific claims of prosecutorial error in greater depth below.

-4-

of the wound indicated that Hall's throat was cut at least three times. This provided ample evidence from which a rational trier of fact could reject Birckelbaw's account of self-defense.

Further, a reasonable trier of fact could find that Birckelbaw's use of deadly force under the circumstances was not necessary to protect himself from imminent death or great bodily harm. Hall sustained a stab wound to the back of his neck, which tends to indicate that he was attacked from behind. Dr. Dragovic also testified that while it was possible for an assailant to slash an individual's throat by approaching from the front, with respect to Hall's injury, "it would be kind of difficult to create the—these tails on the left side of the defect," and that approaching from the back would give the assailant "physical control of the victim." He further elaborated that "this is the kind of situation where slashing of the neck is generally rendered upon a physically controlled individual," which would "allow multiple movements across the neck." While Dr. Dragovic acknowledged that he was not present when the incident occurred, generally to slash someone's neck with control, the victim's head would need to be partially immobilized. Though this is not conclusive evidence that Birckelbaw immobilized Hall before cutting his throat, a juror could reasonably conclude that immobilization was necessary in order to produce the specific injuries that Hall sustained. Finally, while Hall's injuries were severe, Birckelbaw's injuries were limited to a cut on his left thumb and index finger.

In sum, Birckelbaw's conflicting statements regarding the incident, the evidence of multiple controlled attacks to Hall, and the reasonable inference that Hall was attacked from behind and immobilized during the incident tends to cast doubt on Birckelbaw's argument that he "honestly and reasonably believe[d] his life [was] in imminent danger or that there [was] a threat of serious bodily harm and that it [was] necessary to exercise deadly force to prevent such harm to himself." *Dupree*, 486 Mich at 707 (quotation marks and citation omitted). Accordingly, a rational trier of fact could properly reject Birckelbaw's self-defense claim, as there was sufficient evidence to support his second-degree murder conviction beyond a reasonable doubt.

### III. PROSECUTORIAL ERROR

Birckelbaw argues that several of the prosecution's statements during closing argument constituted prosecutorial misconduct because they were not supported by the evidence and improperly appealed to the sympathy of the jury.[3] We disagree.

As an initial note, while Birckelbaw generally preserved the claim that the prosecution argued facts not in evidence by objecting on this basis in the trial court, Birckelbaw's specific claims of error are unpreserved because his "objections did not state arguments regarding the issues now raised on appeal." *People v Evans*, 335 Mich App 76, 88; 966 NW2d 402 (2020). See also *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021) ("[T]o preserve an issue of

---

[3] While "the phrase 'prosecutorial misconduct' has become a term of art in criminal appeals, . . . these claims of error might be better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction.") (quotation marks and citation omitted; alteration in original).

"Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Reversal is required only "if it appears more likely than not that the error was outcome-determinative." *People v Blevins*, 314 Mich App 339, 355; 886 NW2d 456 (2016). However, this Court reviews unpreserved issues of prosecutorial error for plain error. *Isrow*, 339 Mich App at 529. Three requirements must be met to avoid forfeiture under the plain-error rule: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). "The third prong requires that a defendant show prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. (quotation marks and citation omitted).

Claims of prosecutorial misconduct are decided on a case-by-case basis, which requires this Court to "examine the entire record and evaluate a prosecutor's remarks in context." *Isrow*, 339 Mich App at 529 (quotation marks and citation omitted). "[T]he propriety of a prosecutor's remarks depends on the particular facts of each case." *People v Loew*, 340 Mich App 100, 126; 985 NW2d 255 (2022) (quotation marks and citation omitted), aff'd 514 Mich 158 (2024).

Birckelbaw challenges several statements made by the prosecution during closing argument on the basis that the prosecution argued from facts not in evidence. While prosecutors cannot mischaracterize evidence, *Isrow*, 339 Mich App at 529, they "are free to argue the evidence and any reasonable inferences arising from the evidence," *Loew*, 340 Mich App at 126 (quotation marks and citation omitted).

Birckelbaw primarily challenges the prosecution's statements regarding Dr. Dragovic's testimony, specifically the assertions that "Dr. Dragovic said that for something like this to happen, . . . the victim . . . had to be essentially immobilized," and that Hall's injuries "had to be done when he was immobilized." However, as indicated above, Dr. Dragovic's testimony gave rise to a reasonable inference that Hall had to be immobilized to produce the injuries he sustained.

As stated earlier, the pattern of Hall's injury indicated that sharp-force trauma was applied to his neck multiple times. Although Dr. Dragovic acknowledged that he did not know the exact circumstances that gave rise to Hall's injuries, he testified that generally, "when you have an assailant slashing someone's neck with the approach that has a controlled condition, the[] head will be at least partially immobilized in order to expose the neck to the force of slashing." Further, Hall's injury presented "the kind of situation where slashing of the neck is generally rendered upon a physically controlled individual," which would "allow multiple movements across the neck." Given Dr. Dragovic's testimony that a victim would generally need to be immobilized in order for an assailant to slash his or her neck multiple times with control, the prosecution's argument was properly based on reasonable inferences from the evidence.

Birckelbaw also argues that the prosecution's statement that "we know that, at some point, Mr. Birckelbaw was actually . . . behind [Hall], with a knife and delivered a wound from behind to the back of his head," was not a reasonable inference because the evidence did not establish that Birckelbaw was behind Hall when he slashed his throat. However, when read in context, it is clear

that the prosecution was not referring to testimony that Birckelbaw immobilized Hall and slashed his throat from behind, but instead, was arguing based on evidence "that there [was] another knife wound to the back of the head and the back of the neck" in addition to the slash wound on Hall's throat. Dr. Dragovic testified that Hall had a stab wound on the right side of the back of his neck. Accordingly, the prosecution's assertion that Birckelbaw stabbed Hall from behind constituted a reasonable inference from the evidence. This inference is further bolstered when paired with Dr. Dragovic's testimony that it would be difficult for an assailant to slash an individual's throat from the front given the injury that Hall displayed. To the extent that the prosecution overstated the certainty of Birckelbaw attacking Hall from behind, prosecutors "need not confine argument to the blandest of all possible terms[.]" *Loew*, 340 Mich App at 126 (quotation marks and citation omitted; alteration in original).

Birckelbaw also argues that the prosecution misled the jury by stating that "no knife was found, . . . according to the officer who recovered it, I believe it was Lindquist, that the—there was no weapon found . . . with [Hall's] clothes at the hospital, when he was turned over." Officer Lindquist testified that he recovered Hall's clothing at the hospital and did not find any knife or sheath with the clothing. The prosecution's argument therefore comports with the evidence presented.

Next, Birckelbaw maintains the prosecution improperly argued that he "never complained about his injuries to the police." However, reviewed in context, the prosecution argued that while Birckelbaw complained of the cut to his thumb, it was "worth noting that there was some discussion about whether or not there was an injury to his index finger here because there was wet blood." Therefore, the prosecution suggested "that Mr. Birckelbaw never complained of that to the police." Responding officer, Joshua Roelant, testified that Birckelbaw reported sustaining injuries to his hands, which were covered in blood. However, he did not specifically recall seeing the cuts on Birckelbaw's hands. Another police officer, Sean Carter, also could not recall seeing any injuries to Birckelbaw besides the cut on his thumb. Given the inability of Officers Roelant and Carter to recall Birckelbaw's injury to his index finger, the prosecution's statement was a reasonable inference from their testimony.

Birckelbaw also contends that the prosecution implied that Collier was lying when he testified that he got into a fight with Hall. During closing arguments, the prosecution argued that Collier was "not really a reliable witness, nor [was] his information even that relevant" given that some of the events Collier testified about took place 25 years before Hall died. The prosecution also attempted to undercut Collier's testimony that Hall attempted to attack Collier when visiting his home in about 2015, noting that Collier could not give a consistent account of when the alleged attack occurred. Accordingly, the prosecution asserted, "This is not exactly like [Collier's] totally getting this all correct." When read in context, the prosecution's remarks simply advanced the argument that Collier's testimony was unreliable and irrelevant given the time that had passed. Notably, prosecutors are "permitted to argue from the facts that defendant or defendant's witnesses were unworthy of belief." *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007).

In addition to arguing facts not in evidence, Birckelbaw also claims that prosecutorial error occurred because the prosecution made statements that improperly invoked the sympathy of the jury. "Appeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001).

Birckelbaw first argues that the prosecution invited the jury to sympathize with Hall by stating that his wound was "devastating" and representing that Dr. Dragovic testified "the victim would have been in an agony . . . ." On appeal, the prosecution concedes that Dr. Dragovic did not specifically testify that Hall would have been in "agony" as a result of his wounds. However, he did testify that the deep structures of Hall's neck were severed to his esophagus, that Hall was subject to "repetitive slashing," and that Hall was "deadly wounded." Further, Hall did not die immediately but deteriorated over the course of minutes or potentially hours. Champe's testimony also corroborated Hall being in pain because of his injuries. Champe testified that it was difficult to hear Hall speak because he was making a "gurgling" noise. During his phone call to 911, Champe indicated that although Hall was alert, his bleeding was serious.

Based on the severity of Hall's injuries, the prosecution's statement that he was in "agony" was a reasonable inference based on the evidence. Indeed, Birckelbaw concedes that "it certainly is true that Mr. Hall must have endured incredible pain . . . ." And again, the prosecution was not required to "confine argument to the blandest of all possible terms[.]" *Loew*, 340 Mich App at 126 (quotation marks and citation omitted; alteration in original).

Birckelbaw lastly argues that the prosecution improperly appealed to the sympathy of the jury by emphasizing that the crime scene had blood "all over the place." While reviewing photographs of the crime scene, the prosecution repeatedly noted there was "blood everywhere." However, the evidence readily supports this assertion. Officers observed and documented blood in the living room; kitchen sink, counter, and floor; hallway floor and walls; bathroom door, floor, counter, and sink; and the door, floor, and interior of the southwest bedroom. Indeed, Birckelbaw's trial counsel referenced the fact that "there was a lot of blood" during closing argument. Accordingly, the prosecution's remarks about the blood found at the crime scene accurately summarized the evidence presented and did not improperly invoke the sympathy of the jury.

In sum, Birckelbaw cannot establish prosecutorial error arising from the foregoing statements. And even if any error occurred, Birckelbaw cannot establish that it was "more likely than not that the error was outcome-determinative." *Blevins*, 314 Mich App at 355. See also *Isrow*, 339 Mich App at 529 (noting that the plain-error rule requires a showing of prejudice). The trial court specifically instructed the jury that it "may only consider the evidence that has been properly admitted in this case," and that "[t]he lawyers' statements, and the arguments, and any commentary are not evidence." The court also instructed the jury that it "must not let sympathy, bias, or prejudice influence [its] decision." Notably, "[j]urors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted). Accordingly, Birckelbaw cannot make the requisite showing that any purported error was outcome-determinative or affected the outcome of trial.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

As an alternative to his prosecutorial-error argument, Birckelbaw maintains that his trial counsel was ineffective for failing to object to the instances of alleged misconduct. We disagree.

Birckelbaw failed to preserve his claim of ineffective assistance of counsel because he did not move for a new trial or evidentiary hearing in the trial court, see *People v Head*, 323 Mich App

526, 538-539; 917 NW2d 752 (2018), or move in this Court to remand for an evidentiary hearing, see *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

Generally, claims of ineffective assistance of counsel present a mixed question of fact and constitutional law. *Isrow*, 339 Mich App at 531. "All findings of fact are reviewed for clear error, while the legal questions are reviewed de novo. When the reviewing court is left with a definite and firm conviction that the trial court made a mistake, there is clear error." *Id*. (quotation marks and citations omitted). However, "[b]ecause these claims of ineffective assistance of counsel are unpreserved, our review is limited to errors apparent on the record." *Unger*, 278 Mich App at 253.

In his statement of the issues presented, Birckelbaw raises the alternative argument that he was deprived of his right to the effective assistance of counsel because of his trial counsel's failure to object to the instances of prosecutorial error. He also sets forth the standard of review for analyzing ineffective-assistance claims. However, Birckelbaw provides no other legal authority or substantive argument regarding the issue. We therefore deem the issue abandoned for Birckelbaw's failure to brief the issue on appeal. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue.") (quotation marks and citation omitted).[4]

## V. EVIDENTIARY ERROR

Birckelbaw lastly argues that the trial court abused its discretion by permitting Johnston to testify regarding the knife sheath in the basement because her testimony lacked the necessary foundation. We disagree.[5]

This Court reviews claims of evidentiary error for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *Id*. at 251-252 (quotation marks and citations omitted). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 252.

Generally, "it is presumed that preserved, nonconstitutional error—such as evidentiary error—is harmless, and to overcome that presumption the appellant bears the burden of demonstrating, on the strength of the entire record, that it is more probable than not that the error was outcome determinative." *People v Propp*, 340 Mich App 652, 661-662; 987 NW2d 888 (2022)

---

[4] Notably, given our conclusion that no prosecutorial error occurred, Birckelbaw's argument would have failed on the merits. See *Isrow*, 339 Mich App at 532 ("Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel.").

[5] We note that is questionable whether Birckelbaw preserved this issue on appeal because he did not explicitly object to Johnston's testimony for a lack of foundation in the trial court. Furthermore, Birckelbaw relied on arguments he made in earlier proceedings to support his contention that Johnston's testimony was inadmissible, and it is unclear whether the trial court considered those arguments based on Birckelbaw's renewed objection at trial. However, because the parties agree that the issue is preserved, this Court treats the issue as preserved on appeal.

(quotation marks and citation omitted), aff'd 516 Mich 932 (2025). See also MCL 769.26 (providing that a verdict shall not be reversed on the basis of the improper admission or rejection of evidence unless the error resulted in a miscarriage of justice).

As an initial note, Birckelbaw's argument appears to conflate issues regarding the foundation of Johnston's testimony with its substantive admissibility. He argues that the trial court "abused [its] discretion by permitting Ms. Johnston's testimony without ensuring that there was a foundation for testifying about the sheath." However, the import of his argument is that Johnston's testimony was unfairly prejudicial because it connected the sheath found in the basement to the knife recovered at the scene. Therefore, it appears that Birckelbaw's argument does not relate to the foundation for Johnston's testimony, but whether the testimony itself was substantively admissible.[6]

MRE 602 addresses the introduction of witness testimony, and provides, in relevant part: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Here, Johnston testified that she returned to the condo and saw the sheath in plain view on the basement floor. Thereafter, she decided to report the sheath to the police, who recovered it from her. This testimony was permissibly based on Johnston's personal knowledge regarding the circumstances under which she discovered the sheath.

Also relevant to the admissibility of Johnston's testimony is MRE 402, which states that "[r]elevant evidence is admissible" unless otherwise provided by the United States or Michigan Constitutions, the Michigan Rules of Evidence, or other rules prescribed by the Michigan Supreme Court. MRE 401 provides that evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

> (b) the fact is of consequence in determining the action. [MRE 401(a) and (b).]

Finally, MRE 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

---

[6] Birckelbaw asserts that the prosecution expressed "uncertainty that a proper foundation could be laid." However, read in context, the prosecution was simply arguing that it was not precluded from presenting Johnston's testimony in order to lay a foundation for the admission of the physical sheath itself, which is distinct from the issue of whether Johnston's testimony was admissible. The foundation required for physical evidence is not at issue in this case, because the sheath itself, nor any photographs of the sheath, were admitted at trial.

Under these principles, Johnston's testimony that she discovered a knife sheath in the basement where Birckelbaw resided was relevant because it tended to make Birckelbaw's use of a knife to perpetrate the crime more probable than without the evidence. Further, Birckelbaw's connection to the knife was of consequence to determining whether he was guilty of second-degree murder. However, Birckelbaw contends that the testimony should have been excluded because it was unfairly prejudicial. We discern no risk that the jury would give improper weight to Johnston's testimony, especially in light of the other evidence presented in the case. The jury heard statements from Birckelbaw that he was fighting with Hall when "the knife slit his throat," and that "the knife just came across [Hall's] neck." There was very strong support that Birckelbaw was a contributor to the DNA swabbed from the recovered knife. In light of this stronger evidence connecting Birckelbaw to the knife, the probative effect of Johnston's testimony was not likely to substantially outweigh the danger of any unfair prejudice.

Because the testimony was properly introduced, any issues regarding the delayed discovery of the sheath or the reliability of Johnston's testimony would go to the weight of the evidence, rather than its admissibility. See e.g., *People v White*, 208 Mich App 126, 133; 527 NW2d 34 (1994) (noting that deficiencies in a chain of custody are matters of weight, not admissibility). Johnston and the investigating officers were subject to extensive cross-examination regarding the discovery of the sheath, and the jury was free to assign the appropriate weight to the testimony. Therefore, the trial court did not abuse its discretion by allowing Johnston to testify regarding the sheath.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado